UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GREAT LAKES REINSURANCE
(UK) SE,
                              Plaintiff,

                - against -

PETER HERZIG,
                              Defendant.

**MEMORANDUM
<u>OPINION & ORDER</u>**

16 Civ. 9848 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

             This action concerns a marine insurance dispute between Plaintiff Great Lakes

Reinsurance ("Great Lakes") and Defendant Peter Herzig, the owner of a yacht insured by Great

Lakes.  Plaintiff brings this action under this Court's admiralty jurisdiction pursuant to Fed. R.

Civ. P. 9(h).  (Second Amended Complaint ("SAC") (Dkt. No. 48) ¶ 3)  The dispute involves

Defendant's October 2016 claim for coverage under a July 2016 policy issued by Plaintiff (the

"Policy").  (<u>Id.</u> ¶¶ 13-14, 16-17)

             Plaintiff Great Lakes has moved for summary judgment on its Second, Third, and

Fourth Causes of Action.  (Dkt. No. 91)[1]  The Second Cause of Action seeks a declaration that a

December 29, 2016 release Herzig signed – in exchange for $175,000 (the "Release") – is valid

and binding.  (SAC (Dkt. No. 48) ¶¶ 29-34)  The Third Cause of Action seeks a declaration that

the Policy was void <u>ab initio</u> because of material misrepresentations in Herzig's insurance

application.  (<u>Id.</u> ¶¶ 35-45)  The Fourth Cause of Action seeks a declaration that – due to material

---

[1]  Great Lakes has also moved to strike the January 14, 2021 Declaration of Adam Heffner.
(Pltf. R. 56.1 Stmt., Ex. 18 (Heffner Decl.) (Dkt. No. 108-19); Pltf. Mot. to Strike (Dkt. No.
118))

misrepresentations in Herzig's insurance application – Great Lakes is entitled to restitution of the $175,000 it paid to Herzig pursuant to the Release.  (Id. ¶¶ 46-62)

        For the reasons stated below, Plaintiff's motion for summary judgment will be granted in part and denied in part, and Plaintiff's motion to strike will be granted.

## <u>BACKGROUND</u>

## I.    <u>FACTS</u>[2]

        Plaintiff Great Lakes is a marine insurance company based in the United Kingdom.  (Pltf. R. 56.1 Stmt. (Dkt. No. 109) ¶ 15; Usher Decl. (Dkt. No. 94) ¶ 7)  Defendant Peter Herzig resides in Manhattan.  (Herzig Dep. Part 1 (Dkt. No. 99) at 8)[3]  In 1998, Herzig purchased the "Crescendo," a 62-foot yacht, for approximately $1.4 million.  (Def. R. 56.1 Stmt. (Dkt. No. 108) ¶ 77)

### A.    The 2015 Damage to the Crescendo and the <br>     <u>Subsequent Settlement Between Herzig and AIG</u>

        In October 2015, another vessel struck and caused damage to the Crescendo. (Def. R. 56.1 Stmt. (Dkt. No. 108) ¶ 78; Pltf. R. 56.1 Stmt., Ex. D (Dkt. No. 109-4) at 4)  At that time, the Crescendo was insured by AIG pursuant to a policy that provided $600,000 in coverage.  (Def. R. 56.1 Stmt. (Dkt. No. 108) ¶ 79)  Herzig hired Sunseeker Yacht Services LLC

---

[2]  To the extent that this Court cites facts drawn from Great Lakes' Local Rule 56.1 statement, it has done so because Herzig has either not disputed those facts or has not done so with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted).  Where Herzig disagrees with Great Lakes' characterizations of the cited evidence, and has presented an evidentiary basis for doing so, the Court relies on Herzig's characterization of the evidence.  Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion).

[3] The page numbers of documents referenced in this Opinion correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

("SYS") to repair the Crescendo and submitted a claim to AIG for coverage of the necessary repairs.  (Id. ¶¶ 79-80)

Herzig did not agree with AIG's evaluation of the damage suffered by the Crescendo, and hired his own surveyor, Roy Shorter.  (Id. ¶ 81)  Defendant also retained a lawyer, Adam Heffner.  (Pltf. R. 56.1 Stmt. (Dkt. No. 109) ¶ 59)  In March 2016, Shorter inspected the Crescendo along with an AIG surveyor and SYS's owner, Mark Hatchard.  (Def. R. 56.1 Stmt. (Dkt. No. 108) ¶ 81)  After the inspection, Shorter concluded that the Crescendo had suffered damage on both sides and recommended that more samples be obtained from the vessel's core.  On March 28, 2016, Hatchard issued an estimate concluding that it would cost $257,277 to repair the damage, with the possibility of an increase in cost if more damage was discovered.  (Id. ¶¶ 82-83)  In a May 3, 2016 letter to Herzig, Hatchard states that his March 28, 2016 estimate was based on "the minimum amount of hours and materials required" and that, "[b]ased on experience, [there was] every reason to expect that the total cost of repairs [would] exceed the $270,000 estimate plus applicable taxes, insurance charges, and fees."  (Id. ¶ 84)[4]

Herzig later settled his claim with AIG for $600,000, the full face value of the policy.  (Id. ¶ 85)  The full cost of repairs to the Crescendo, however, turned out to be less than Hatchard's $270,000 estimate.  (Pltf. R. 56.1 Stmt. (Dkt. No. 109) ¶ 28)

**B.**    **Herzig's Purchase of a Great Lakes Policy**

In May 2016, after settling with AIG, Herzig retained Crystal & Company, a "retail insurance broker," to assist him in obtaining new coverage for the Crescendo.  Herzig's primary contact at Crystal was John Poplawsky.  (Pltf. R. 56.1 Stmt. (Dkt. No. 109) ¶¶ 10-13)

---

[4]  There is no explanation in the record as to why Hatchard's initial March 28, 2016 estimate was $257, 277, while his May 3, 2016 letter refers to a $270,000 estimate.

Crystal, in turn, contacted Quaker Special Risks Ltd. for help in securing a quote. Quaker is a "wholesale" or "surplus lines" broker, meaning that it assists retail brokers but does not deal directly with insureds.  (Id. ¶ 14; Def. R. 56.1 (Dkt. No. 108) Stmt. ¶ 86)  Moreover, according to Daniel Walsh, a director at Quaker, Quaker is not authorized to act on behalf of retail brokers such as Crystal.  (Def. R. 56.1 Stmt. (Dkt. No. 108) ¶ 88; Def. R. 56.1 Stmt., Ex. 24 (Walsh Dep.) (Dkt. No. 108-25) at 12)

In a May 18, 2016 email to Christopher Reid at Quaker, Crystal's Poplawsky asked:  "Do you have a market for a $600,000, 62ft yacht that had a loss last October and is being non-renewed by AIG?  The boat is currently undergoing $270,000 of repairs and the plan is to have the boat in the water by 6/20 once certified."  Reid replied that he did "have markets for this" and would send Crystal an application to complete.  (Pltf. R. 56.1 Stmt. (Dkt. No. 109) ¶¶ 19-20; Pltf. R. 56.1 Stmt., Ex. C (Dkt. No. 109-3) at 2)

Later that day, Reid sent an application to Poplawsky, stating that "details of loss, etc., will help get terms."  (Pltf. R. 56.1 Stmt., Ex. E (Dkt. No. 105) at 2)  The application Reid provided was from Concept Special Risks Ltd. ("Concept"), a U.K.-based company that acts as an underwriter and claims agent for Great Lakes.  (Id. ¶ 16; Def. R. 56.1 Stmt. (Dkt. No. 108) ¶ 89)  On May 19, 2016, Poplawsky partially completed the application and returned it to Reid.  (Pltf. R. 56.1 Stmt. (Dkt. No. 109) ¶ 23; Pltf. R. 56.1 Stmt., Ex. C (Dkt. No. 109-3) at 4)  On May 20, 2016, Reid forwarded the application to Concept, and wrote, "Please let me know if you can offer terms on the attached.  Details of loss below.  Please let me know if you require more info to quote."  (Pltf. R. 56.1 Stmt. (Dkt. No. 109) ¶ 24)

The application Poplawsky submitted sought $600,000 in coverage.  The application indicates that the Crescendo had been constructed in 1998 and was purchased by

Herzig at that time for $600,000.[5]  (Def. R. 56.1 Stmt. (Dkt. No. 108) ¶ 90; Pltf. R. 56.1 Stmt.,

Ex. D (Dkt. No. 109-4) at 2)

        In a May 23, 2016 email to Reid, Neil Burton – an underwriter at Concept –

requests more information concerning the prior loss:  "Could you obtain a bit more info on this

loss please?  Exactly what happened?  Was this vessel made a constructive total loss?  If AIG

paid out $600,000 for damages, why is the repair only costing $270,000?  Did the applicant buy

the hull back from AIG?  If so, for what amount?"  (Pltf. R. 56.1 Stmt. (Dkt. No. 109) ¶ 25)

        Later that day, Poplawsky requests additional information from Herzig

concerning the prior loss:

> Can you provide a few words on exactly what happened to cause the loss and
> provide further information on the specific damages to the vessel?  You
> mentioned that there was $270,000 of repairs to the vessel, $100,000 of which is
> for the paint.  Is the $270,000 what remains or is that the repair cost in full?  Was
> the vessel made a total loss and is that why AIG paid out the full $600,000?  If
> not, please advise why AIG paid the $600,000 if the repairs are $270,000 in full.

(Id. ¶ 26)  Herzig responded to Poplawsky's questions by telephone.  (Def. R. 56.1 Stmt. (Dkt.

No. 108) ¶ 27)

        In a May 24, 2016 email to Concept, Reid provides the following additional

information concerning the settlement with AIG and the costs of repair:

> The AIG adjuster handled the claim very poorly from the beginning which led the
> client to hire his own surveyor who confirmed additional damage that was
> originally undocumented.  As such, the client hired a lawyer in FL as this was a
> bad faith claim handling.  Client advised that once the head of global watercraft
> claims at AIG was involved, and reviewed the claims handling, looked to settle
> with the client.  He advised he likely could have received more thru a suit (loss of
> resale, etc.) but "settled" with AIG for the policy max of $600k.
>
> The $270k is the rough final number of total costs the client will have paid to
> repair the boat. $100k for painting and $15,000 for a licensed surveyor to monitor

---

[5]  It is undisputed that Herzig purchased the Crescendo for approximately $1.4 million.  (Pltf. R.
56.1 Stmt. (Dkt. No. 109) ¶ 8; Def. R. 56.1 Stmt. (Dkt. No. 108) ¶ 77)

the repairs (client has two reports already) are two components of the $270 total repair cost.

It should be noted that last spring the client paid $250k for 1,000-hour engine service which was also completed by Sunseeker.

(Pltf. R. 56.1 Stmt. (Dkt. No. 109) ¶ 29; Pltf. R. 56.1 Stmt., Ex. H. (Dkt. No. 109-8) at 2)

While Herzig did not pay $250,000 for a 1,000-hour engine service in 2015 (Pltf. R. 56.1 Stmt. (Dkt. No. 109) ¶ 31),[6] he did spend more than $250,000 on "repairs, service and upgrades to Crescendo, including but not limited to the vessel's engines," in 2015.  (Def. R. 56.1 Stmt. (Dkt. No. 108) ¶ 36)

On May 25, 2016, Concept supplied Crystal with a quote for a $600,000 policy (Pltf. R. 56.1 Stmt. (Dkt. No. 109) ¶ 33), and on May 27, 2016, Concept issued a "temporary binder" in which it  agreed to insure the Crescendo for $600,000 on the condition that Herzig obtain a "condition and valuation survey" and a "Letter of Survey Recommendations Compliance," absent which the binder would become null and void.  (Def. R. 56.1 Stmt. (Dkt. No. 108) ¶ 92)

Herzig subsequently retained marine surveyor R.T. Scanlan to conduct a condition and valuation survey (the "Scanlan Survey").  (Id. ¶ 93)

Meanwhile, Concept prepared the Policy, which provides coverage of $600,000 for the Crescendo.  The Policy – which lists Great Lakes as the "Insurance Provider" – is dated

---

[6]  At deposition, Herzig did not recall telling anyone at Crystal about this alleged expense, and he had no explanation as to why Crystal would have conveyed this assertion to Concept.  (Pltf. R. 56.1 Stmt. (Dkt. No. 109) ¶ 31)  Herzig nevertheless disputes paragraph 31 of Great Lakes' Local Rule 56.1 statement, because "the . . . deposition passage [quoted in it] does not fully and accurately reflect the questions made and answers given."  (Def. R. 56.1 Stmt. (Dkt. No. 108) ¶ 31)  This is quibbling.  The exchange Great Lakes' quotation omits – "Q:  Do you know why [the May 24, 2016 email] says that [the client paid $250k for a 1,000-hour engine service] here?  A:  No." (Herzig Dep. Part 2 (Dkt. No. 100) at 35) – is consistent with Great Lakes' description of Herzig's testimony.  In sum, Herzig has not demonstrated that there is an issue of fact about whether he paid $250,000 for a 1,000-hour engine service in 2015.

July 8, 2016.  (Pltf. R. 56.1 Stmt. (Dkt. No. 109) ¶ 36; Pltf. R. 56.1 Stmt., Ex. A (Dkt. No. 109-1)

at 2-3)  The Policy states that it is "[w]arranted that a new in water condition valuation survey . .

. is seen and approved by underwriters prior to operation of the Scheduled Vessel [the

Crescendo] and no later than the 1st August 2016."  (Pltf. R. 56.1 Stmt., Ex. A (Dkt. No. 109-1)

at 3)

> In addition to the policy limit of $600,000, the Policy includes the following

provisions:

- the term of the Policy is from May 26, 2016, to May 26, 2017 (id. at 2);

- "Quaker Special Risk New Jersey" is "Assured's Agent" and the parties "agreed that [Herzig's] brokers or any substituted brokers (whether surplus line approved or otherwise) shall be deemed to be exclusively the agents of [Herzig] and not of [Concept] in any and all matters relating to, connected with or affecting this insurance" (id. at 2, 13);

- "[t]his contract is null and void in the event of non-disclosure or misrepresentation of a fact or circumstance material to our acceptance or continuance of this insurance" (id. at 14);

- the Policy "may be cancelled by either [party] at any time, subject to 10 days' prior written notice" (id. at 13); and

- "any dispute arising hereunder shall be adjudicated according to well-established, entrenched principles and precedents of substantive United States Federal Admiralty law and practice but where no such well-established, entrenched precedent exists, this insuring agreement is subject to the substantive laws of the State of New York."  (Id. at 17)

> On July 18 2016, Scanlan completed his survey, which values the Crescendo at

$625,000.  (Def. R. 56.1 Stmt. (Dkt. No. 108) ¶ 93; Def. R. 56.1 Stmt., Ex. C (Dkt. No. 108-4) at

2)  Later that month, after reviewing the Scanlan Survey, Concept issued the Policy to Herzig.

(Def. R. 56.1 Stmt. (Dkt. No. 108) ¶ 35)

C.      **The 2016 Damage to the Crescendo and the Ensuing Claim**

On or about October 7, 2016,[7] Hurricane Matthew caused damage to the

Crescendo while it was in port near Jacksonville, Florida.  (Def. R. 56.1 Stmt. (Dkt. No. 108) ¶

94)  Herzig arranged for the vessel to be transported to Lauderdale Marine Center in Ft.

Lauderdale for repairs.  (Def. R. 56.1 Stmt., Ex. 22 (Westcott Decl.) (Dkt. No. 108-23) ¶ 5)

Defendant submitted a claim under the Policy to Concept.  (Def. R. 56.1 Stmt. (Dkt. No. 108) ¶

94)  Concept retained claim investigator and adjuster Doug Wager of Wager & Associates to

investigate the claim.  Wager assigned Michael Grant as the field surveyor.  (Pltf. R. 56.1 Stmt.

(Dkt. No. 109) ¶¶ 39-40)

In an October 10, 2016 email to Poplawsky, Herzig writes:  "In the AIG debacle, I

was too patient and nice at the beginning, and they tried to take advantage of that and trample

me.  Lesson learned.  I will be pro-active and determined to defend my interests from the outset

here."  (Pltf. R. 56.1 Stmt. (Dkt. No. 109) ¶ 46)  Herzig also discussed the Hurricane Matthew

damage with Shorter, the surveyor he had retained when the Crescendo had suffered damage in

2015.  In an October 17, 2016 email to Herzig, Shorter reports that – although he had not

boarded the Crescendo – "it was readily apparent that the yacht had suffered severe structural

hull damage on the starboard side as a result of it being caught in Hurricane Matthew."  (Id. ¶ 43)

On or about November 1, 2016, Herzig retained Shorter to attend Michael Grant's

upcoming inspection of the Crescendo.  (Id. ¶ 41; Def. R. 56.1 Stmt. (Dkt. No. 108) ¶ 95)  On

November 3, 2016, Grant conducted the inspection, with Shorter in attendance.  (Pltf. R. 56.1

Stmt. (Dkt. No. 109) ¶ 41; Def. R. 56.1 Stmt. (Dkt. No. 108) ¶ 95)  In a November 4, 2016 email

---

[7]  Neither party's Local Rule 56.1 statement specifies the date of the damage, but other materials
in the record refer to October 7, 2016.  (See, e.g., Pltf. R. 56.1 Stmt., Ex. L (Dkt. No. 109-12) at
2; Herzig Dep. Part 1 (Dkt. No. 99) at 15; SAC (Dkt No. 48) ¶ 16)

to Herzig, Shorter reports that, "in order to ascertain the full extent of the structural hull damage and the cost of repairs, [Shorter had] pointed out to all in attendance [at the inspection] that the correct way to survey this yacht [was] out of the water, using instruments and other proven skill methods." (Pltf. R. 56.1 Stmt. (Dkt. No. 109) ¶ 44)

     **D.**    <u>**Concept Reduces Coverage for the Crescendo**</u>

        In mid-November 2016, while Herzig's claim for the October 2016 hurricane damage was still pending, Concept claims manager Mark Thomas reviewed a preliminary report from Wager concerning Herzig's claim, and raised a "concern[] as to the stated and agreed value of [the] vessel." (Def. R. 56.1 Stmt., Ex. D (Dkt. No. 108-5) at 4; Usher Decl. (Dkt. No. 97) at 23) In a November 17, 2016 email to Thomas, Concept's underwriting manager, Liam Gilhooly, describes the Scanlan Survey and the issuance of the Policy and states, "[w]e would not routinely question the valuation provided by a suitably experienced surveyor, unless something appeared untoward within the quote/bind process, which does not appear to be the case looking at the file." (Def. R. 56.1 Stmt. (Dkt. No. 108) ¶ 97) Later that day, Thomas responds that it is "commonsense that a vessel purchased in 1996 for 600K isn't going to be worth 600K 20 years later." Gilhooly replies that Scanlan "appears to be well experienced, provides a detailed survey, notes on page 11 that 'considerable money [was] invested in this yacht' and the photographs provided appear to show a vessel in good condition. From an underwriting perspective, we would not normally do more than we have done here to determine the value of the vessel." (<u>Id.</u>; Def. R. 56.1 Stmt., Ex. D (Dkt. No. 108-5) at 4)

        In a November 18, 2016 email to Concept's managing director, B.A. Usher, Gilhooly reports that he has "taken a look on Yachtworld and it does appear that the vessel values (on average) are around the $300,000 mark. Procedurally would we inform the broker of our intention to endorse the policy to reduce the coverage or do we just do it and email at the

same time?"  (Def. R. 56.1 Stmt., Ex. E (Dkt. No. 108-6) at 2)  Usher responds:  "I think we

should just go ahead and do it."  (Id.)  Concept's endorsement department then issued an

endorsement, dated November 18, 2016, which states that "[t]he Hull Sum insured is reduced to

$300,000 . . . . In consideration of which, a Return Premium of US$1,954 is due."[8]  (Id. at 1, 3)

Crystal's Poplawsky received the November 18, 2016 endorsement on the day it

was issued.  (Def. R. 56.1 Stmt., Ex. 23 (Poplawsky Decl.) (Dkt. No. 108-24) ¶ 8)  Poplawsky

observed that the November 18, 2016 Endorsement had not been "approved and stamped by the

Excess Line Association of New York," which he understood to be a requirement under New

York law, and therefore he "did not believe it was effective."  (Id. ¶ 9)  Poplawsky states that he

"does not believe [he] informed Mr. Herzig about the Purported Endorsement until December

30, 2016."  (Id. ¶ 10)  Poplawsky further states that he did not receive an Excess Line

Association-approved version of the November 18, 2016 endorsement until January 3, 2017.  (Id.

¶ 11)

### E.    The December 2016 Negotiation, Litigation, and Settlement

After Concept's surveyor inspected the Crescendo, Herzig obtained a repair

estimate from two boat yards and retained a lawyer – Adam Heffner.  Heffner had represented

Herzig in negotiations with AIG regarding Herzig's earlier insurance claim.  (Pltf. R. 56.1 Stmt.

(Dkt. No. 109) ¶¶ 49-50, 52, 59; Def. R. 56.1 Stmt., Ex. 17 (Herzig Decl.) (Dkt. No. 108-18) ¶

11 and Ex. F (Dkt. No. 108-7) at 2)  Herzig then began negotiating a settlement of his claim with

Wager, Concept's adjuster.  (Def. R. 56.1 Stmt. (Dkt. No. 108) ¶ 100)

Wager made a settlement offer to Herzig, and on December 19, 2016, Herzig

emailed a counterproposal to Wager.  (Def. R. 56.1 Stmt. (Dkt. No. 108) ¶ 101)  In the December

---

[8]  The "Hull Sum Insured" is the Policy limit.  (Pltf. R. 56.1 Stmt., Ex. A (Dkt. No. 109-1) at 2)

19, 2016 email, Herzig states that he has repair "quotes from two yards," one with an "all-in

price . . . [of] approximately $490,000," and another with an "all-in price" of "approximately

$155,000," not including "approximately $10,000 . . . already incurred." (Def. R. 56.1 Stmt., Ex.

F. (Dkt. No. 108-7) at 2)  Herzig proposed that Concept make a lump-sum payment of $300,000

to him by December 26, 2016; that the Policy remain in effect for its duration; and that Herzig

provide Concept with a release "accepting responsibility for any costs above [the agreed

payment of $300,000]." (Id. at 2-3)

On December 21, 2016, Great Lakes filed the Complaint. (Dkt. No. 1)  The

Complaint seeks a declaratory judgment that the Policy provides coverage for "no more than the

reasonable cost of repairs," and that here the reasonable cost of repairs amounted to no more than

$175,000. (Id. at 5-6)

In a December 27, 2016 letter to Concept, Heffner – representing Herzig – states

that Herzig will settle for $300,000, as long as coverage under the Policy is continued through

the end of its term. (Def. R. 56.1 Stmt. (Dkt. No. 108) ¶ 105)  Heffner warns that the survey

conducted on behalf of Great Lakes is inadequate:

> You are basing your position on a woefully inadequate survey.  It is without
> dispute that you are evaluating the damages sustained by the subject vessel based
> upon a surveyor who did, at best, a cursory inspection while the vessel remained
> in the water.  We are at a complete loss as to how your surveyor can issue
> opinions that will dictate substantial repairs to a substantial vessel, without the
> vessel being placed in dry dock and subject to a thorough survey as dictated by
> standard and accepted practices and procedures followed by licensed and
> experienced surveyors in the subject community.  We stand by the estimates and
> opinions we have obtained from professionals with decades of experience
> evaluating issues comparable to those presented herein.

(Dec. 27, 2016 Heffner Ltr. (Dkt. No. 115) at 3)

In a December 28, 2016 email, Steven Goldman – counsel for Great Lakes –

replies to Heffner's letter as follows:

> Be advised that there will be no further or additional sums offered by way of
> settlement in this matter.  Furthermore, now that the coverage dispute has gone
> into litigation, please be advised that the offer of $175,000 referenced in Mr.
> Thomas' letter of December 23, 2016 will be withdrawn in the event Mr. Herzig
> chooses to contest the Complaint for Declaratory Judgment which is now pending
> in federal district court in Manhattan.

(Def. R. 56.1 Stmt. (Dkt. No. 108) ¶ 106; Dec. 28, 2016 Goldman Email and Ltr. (Dkt. No. 115)

at 5-6)

After a phone conversation between Goldman and Heffner later that day, Heffner

sent the following 12:15 p.m. email to Goldman:

> Please allow this to confirm our telephone conversation, wherein on behalf of
> [Herzig], [Great Lakes]'s offer of $175,000 is accepted . . . .  Additionally,
> [Herzig] will retain ownership of the subject vessel, and the [Policy] will remain
> in full force and effect through the termination date specified in the [P]olicy.

(Def. R. 56.1 Stmt., Ex. G (Dkt. No. 108-8) at 4)

In a 1:56 p.m. email, Goldman states that Great Lakes "insists upon the immediate

termination of any and all coverage under [the Policy], with no return of premium."  Goldman

also attaches a draft policyholder's release to be executed by Herzig.  Goldman also states that,

after the release is executed, he will "file a Notice of Dismissal with the clerk at the SDNY."  (Id.

at 3)

In a 3:04 p.m. email, Heffner states:  "[M]y client will agree to the terms below

with the exception of the immediate termination of coverage.  In that respect, we are requesting

the coverage remain in full force for a period of 90 days from the date of settlement, in order to

afford my client a reasonable opportunity to obtain replacement coverage."  (Id.)

On December 29, 2016, in a 9:05 a.m. email, Goldman transmits a "final

settlement offer."  Goldman states that Great Lakes will pay Herzig $175,000 and maintain the

Policy, "with coverage limited to Port Risk only, for a period of 30 days."  Goldman adds:

[P]lease understand that this is a final settlement offer, and that no different or better terms will be forthcoming.  Rejection of this good faith offer will result in the immediate cancellation of [the Policy], followed by service of the Complaint for Declaratory Judgment filed in federal district court in NYC.

(Id. at 2)  Goldman does not set a deadline for Herzig to respond to Great Lakes' offer.

Heffner states in his declaration, however, that Goldman orally "warned [him] that, if Mr. Herzig did not accept these terms by the end of the workweek (which was the next day, December 30th), his insurance would be immediately cancelled, and Mr. Goldman would quickly advance the case filed against him.  Mr. Goldman asserted that any challenge to the insurer's position would result in the immediate termination of discussions with no opportunity to renew them at a later date."  (Def. R. 56.1 Stmt., Ex. 18 (Heffner Decl.) (Dkt. No. 108-19) ¶ 18 (emphasis in original))[9]  Herzig says that Heffner relayed to him Goldman's threat about the cancellation of coverage on December 30, 2016 if Herzig did not accept Great Lakes' settlement offer.  (Def. R. 56.1 Stmt., Ex. 17 (Herzig Decl.) (Dkt. No. 108-18) at ¶ 26)

In a 9:40 a.m. email to Heffner, Goldman attaches the November 2016 Endorsement and states:

One final matter has been brought to my attention, counselor.  During the 30 days of continued coverage, on Port Risk only, the insured value of the vessel would be $125,000.00.  In this regard, please note that I am attaching hereto the [November 2016 Endorsement] reducing the Hull Sum Insured to $300,000.00 . . . .  With an Agreed Value of $300,000.00 per the attached endorsement, and with a pending claim for damages amounting to $175,000.00, the insured value of the vessel during the 30 days of continued coverage would be the figure of $125,000.00 referred to above.

---

[9]  As discussed below, Heffner died on August 31, 2022, and this Court concludes that his declaration would not be admissible at trial, and thus may not be considered on this motion for summary judgment.  See Fed. R. Civ. P. 56(c)(4).  The Court accordingly grants Great Lakes' motion to strike the Heffner declaration.  (Dkt. No. 118)  This Court notes, however, that even if the Heffner declaration were admissible, the outcome on this motion would be the same.  For this reason, this Court includes in its factual account relevant excerpts from the Heffner declaration, and explains in its legal discussion why consideration of these excerpts does not change the outcome.

(Def. R. 56.1 Stmt., Ex. G. (Dkt. No. 108-8) at 2)  Like the version Poplawsky had received on

November 18, 2016, the version of the November 2016 Endorsement attached to this December

29, 2016 email does not bear the approval stamp of the Excess Line Association.  (See Dkt. No.

117 at 6-7)

> In his declaration, Heffner states that when he

> called Mr. Goldman to challenge the contentions in his email, he was adamant
> that the endorsement was valid.  To support his position, Mr. Goldman
> represented that his client had already credited a premium payment back to Mr.
> Herzig's insurance broker.  It seemed reasonable to me that such credit would not
> have been issued had the endorsement been prospective only.  Indeed, Mr.
> Goldman never indicated that the purported change in value to the policy was
> prospective only and had no effect on Mr. Herzig's pending claim.  Rather, Mr.
> Goldman represented, and based on what I understood, that the endorsement was
> current and in place and applicable to the policy at issue in the parties' settlement
> negotiations.  That is, that the existing policy limit was not $600,000 but instead
> $300,000.

(Def. R. 56.1 Stmt., Ex. 18 (Heffner Decl.) (Dkt. No. 108-19) ¶¶ 21-22 (citation omitted;

formatting altered))

> Herzig states in his declaration that

> Mr. Heffner relayed to me Mr. Goldman's representation to him that the
> endorsement was valid because apparently a premium credit had been already
> issued back to my insurance broker to account for the reduction in coverage.
> Based on this representation coming from a lawyer, I believed and had every
> reason to believe that the endorsement applied retroactively to my pending
> insurance claim, namely that the existing policy limit was not $600,000 but
> instead $300,000.  From my perspective, the difference between the represented
> value of my policy (i.e., $300,000), when compared with the settlement amount
> offered to me (i.e., $175,000), was not worth jeopardizing the value of my entire
> investment in the vessel, both in actual and sentimental value, and having to
> undergo the significant resources to fighting an insurer in court for the proper and
> required payment under the policy.

(Def. R. 56.1 Stmt., Ex. 17 (Herzig Decl.) (Dkt. No. 108-18) ¶¶ 30-31 (formatting altered))

> In a December 29, 2016, 11:21 a.m. email to Goldman, Heffner states:

> Please be advised that my client is signing the release and I will email you the
> executed document shortly.  The original will follow [b]y mail.  Please overnight

14

the settlement check . . . .  Additionally, pursuant to [the November 2016
Endorsement], which my [client] had never seen before, a return in premium is
due my client in the amount of $1,954.00.  Please inquire as to the status of this as
my client has never received it.

(Def. R. 56.1 Stmt., Ex. N (Dkt. No. 108-15) at 2)

About 20 minutes later, Goldman replies:  "As I advised, the return premium in

the amount of $1,945.00 was credited back to your client's broker.  I would therefore

respectfully suggest that your inquiries in this regard be directed to the latter."  (Id.)

It is undisputed, however, that as of December 29, 2016, the $1,945.00 premium

credit had not been sent to Crystal.  (Def. R. 56.1 Stmt. (Dkt. No. 108) ¶ 113)

On December 29, 2016, Herzig executed a policyholder's release (the "Release").

The Release states that – in exchange for a payment of $175,000 – Herzig

> Release[s], acquit[s], and forever discharge[s] [Great Lakes] and Concept Special
> Risks Ltd. . . .  of and from any and all [claims] which [Herzig or his] heirs,
> executors, administrators and assigns ever had, now have, or hereafter can, shall,
> or may have for . . . any and all known and unknown damage and/or property
> damage resulting . . . from the incident and the resulting claim for insurance
> coverage involving . . . Crescendo insured under [the Policy] which is alleged to
> have occurred on or about October 7, 2016 . . . which incident and resulting claim
> under [the Policy] was the subject of the Complaint in [this case].
> . . . .
> In making this release and agreement it is understood and agreed that I am relying
> wholly upon my own judgment, belief, and knowledge of the nature, extent and
> duration of said injuries, and that I have not been influenced to any extent
> whatever in making this release by any representations or statements regarding
> said injuries, or regarding any other matters, made by persons, firms or
> corporations who are hereby released, or by any person or persons representing
> him or them.
> . . . .
> It is further agreed that a Stipulation for Dismissal with Prejudice pertaining to the
> above referenced Complaint filed by the Releasors and/or the latter's counsel will
> be provided by Releasors and/or their counsel within 30 days of the date of this
> agreement.

(Pltf. R. 56.1 Stmt. (Dkt. No. 109) ¶ 57; Pltf. R. 56.1 Stmt., Ex. L (Dkt. No. 109-12) at 2-3)[10]

It is undisputed that Great Lakes provided a $175,000 settlement check made payable to Herzig and dated December 29, 2016, and that Herzig received that check.  (Pltf. R. 56.1 Stmt. (Dkt. No. 109) ¶ 57)

On January 11, 2017, Quaker sent Crystal the $1,945.00 premium credit referenced in the November 2016 Endorsement.  (Def. R. 56.1 Stmt. (Dkt. No. 108) ¶ 113)

The Stipulation for Dismissal with Prejudice referenced in the Release was never filed on the docket.

### F.    **Heffner's Death**

Heffner died on August 31, 2022.  See November 1, 2022 In Memoriam, The Florida Bar News (Oct. 31, 2022), https://www.floridabar.org/the-florida-bar-news/november-1-2022-in-memoriam/.

## II.    **PROCEDURAL HISTORY**

Great Lakes filed the Complaint on December 21, 2016, seeking a declaration that it owed no more than $175,000 under the Policy, that being the reasonable cost of repairing the October 2016 damage to the Crescendo.  (Dkt. No. 1)

Great Lakes filed the Amended Complaint on April 7, 2017.  (Dkt. No. 8)  The Amended Complaint adds a second cause of action for a declaration that the Release is valid and binding.  (Id. ¶¶ 23-28)

On May 17, 2017, Herzig filed his Answer with counterclaims.  (Dkt. No. 14) Herzig's counterclaims are for fraud, rescission, breach of contract, and breach of the covenant of good faith and fair dealing.  (Id. at 7-13, ¶¶ 9-39)

---

[10]  In the Release, "Releasor" is defined as Herzig.  (Pltf. R. 56.1 Stmt., Ex. L (Dkt. No. 109-12) at 2)

On June 13, 2018, Great Lakes filed the Second Amended Complaint ("SAC"), which adds the third and fourth causes of action seeking declarations that Herzig's misrepresentations of material fact rendered the Policy void ab initio and entitle Great Lakes to restitution of its $175,000 payment in connection with the Release.  (Dkt. No. 48)

On July 2, 2018, Herzig filed his Answer to the SAC with counterclaims.  (Dkt. No. 49)  The counterclaims are for fraud, rescission, and breach of contract.  (Id. at 15-21, ¶¶ 37-77)

On January 4, 2019, Herzig moved for leave to amend his counterclaims to add a claim for breach of the covenant of good faith and fair dealing, and for his counterclaims to be heard by a jury.  (Dkt. No. 62)  This Court denied his motion on September 23, 2019.  (Dkt. No. 72)

On November 22, 2019, Herzig moved for leave to amend his Answer to add an affirmative defense of economic duress.  (Dkt. No. 80)  This Court denied Herzig's motion on August 25, 2020 on grounds of futility, finding that the proposed duress defense would not survive a motion to strike.  (Dkt. No. 86)

On January 29, 2021, Great Lakes moved for summary judgment on the SAC's Second, Third, and Fourth Causes of Action.  (Dkt. No. 91)

In an October 13, 2022 letter, Herzig informed this Court of Heffner's death. (Dkt. No.  114)  In a December 22, 2022 order, this Court directed the parties to make supplemental submissions addressing whether the Court should consider Heffner's declaration – in connection with Great Lakes' summary judgment motion – given his death.  (Dkt. No. 116) On January 5, 2023, Great Lakes moved to strike Heffner's declaration (Dkt. No. 118), and on January 12, 2023, Herzig filed his opposition to Great Lakes' motion to strike.  (Dkt. No. 119)

## DISCUSSION

### I.    CHOICE OF LAW

The Policy's choice of law provision states that "any dispute arising hereunder shall be adjudicated according to well-established, entrenched principles and precedents of substantive United States Federal Admiralty law and practice but where no such well-established, entrenched precedent exists, this insuring agreement is subject to the substantive laws of the State of New York."  (Pltf. R. 56.1 Stmt. (Dkt. No. 109) ¶ 76)

The parties do not address whether the Policy's choice of law provision applies to Great Lakes' motion for summary judgment on its Second Cause of Action, regarding the validity of the Release.  Great Lakes assumes that the choice of law provision applies and asserts that "there is no rule of federal admiralty law on this subject, and the Court must therefore have reference to New York State law."  (Pltf. Reply Br. (Dkt. No. 111) at 5)  Herzig cites to New York law.  (See Def. Opp. (Dkt. No. 106) at 24-28)  Given these circumstances, this Court will apply New York law in determining the enforceability of the Release.  See Golden Pac. Bancorp v. F.D.I.C., 273 F.3d 509, 514 n.4 (2d Cir. 2001) (citing Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000)) ("The parties' briefs assume that New York substantive law governs the issues of contract interpretation and statute of limitations presented here, and such implied consent is, of course, sufficient to establish the applicable choice of law.").

As to Great Lakes' Third and Fourth Causes of Action regarding Herzig's alleged misrepresentations in his insurance application, the parties agree that maritime law governs. Because the marine insurance doctrine of uberrimae fidei, or utmost good faith, is "well-established [and] entrenched," this Court agrees.

## II.   <u>LEGAL STANDARDS</u>

### A.   <u>Summary Judgment</u>

Summary judgment is warranted when the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." <u>Beyer v. County of Nassau</u>, 524 F.3d 160, 163 (2d Cir. 2008).  "'[W]here the nonmoving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim.'"  <u>Lesavoy v. Lane</u>, No. 02 Civ. 10162, 2008 WL 2704393, at *7 (S.D.N.Y. July 10, 2008) (quoting <u>Bay v. Times Mirror Magazines, Inc.</u>, 936 F.2d 112, 116 (2d Cir. 1991)).  "If the movant meets its burden, 'the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment.'"  <u>UMB Bank, N.A. v. Bluestone Coke, LLC</u>, No. 20-CV-2043 (LJL), 2020 WL 6712307, at *3 (S.D.N.Y. Nov. 16, 2020) (quoting <u>Jaramillo v. Weyerhaeuser Co.</u>, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'"  <u>Spinelli v. City of New York</u>, 579 F.3d 160, 166 (2d Cir. 2009) (quoting <u>Brown v. Henderson</u>, 257 F.3d 246, 251 (2d Cir. 2001)).  However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment . . . .  [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'"  <u>Hicks v. Baines</u>, 593 F.3d 159, 166 (2d Cir. 2010) (alterations in original) (quoting <u>Fletcher v. Atex, Inc.</u>, 68 F.3d 1451, 1456 (2d Cir. 1995)).

"An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).  Because of this admissibility requirement, "'[h]earsay testimony that would not be admissible if testified to at the trial may not properly be set forth in [an] affidavit.'"  Major League Baseball Properties, Inc. v. Salvino, Inc., 542 F.3d 290, 310 (2d Cir. 2008) (quoting Beyah v. Coughlin, 789 F.2d 986, 989 (2d Cir. 1986)).

### B.   The Declaratory Judgment Act

The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration. . . ."  28 U.S.C. § 2201(a).  The Act thus "confers on federal courts 'unique and substantial discretion in deciding whether to declare the rights of litigants.'"  Peconic Baykeeper, Inc. v. Suffolk Cty., 600 F.3d 180, 187 (2d Cir. 2010) (quoting Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995)).

"By its very language, the Declaratory Judgment Act makes clear that a court must have subject matter jurisdiction over a case on some other basis before it may grant declaratory or injunctive relief."  Fraternal Order of Police, Nat'l Labor Council, USPS No. 2 v. U.S. Postal Serv., 988 F. Supp. 701, 705 (S.D.N.Y. 1997) (citing Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671-72 (1950); PDK Labs, Inc. v. Friedlander, 103 F.3d 1105, 1110 (2d Cir. 1997)).  "The Declaratory Judgment Act is not an independent source of federal subject matter jurisdiction."  Id.

Here, this Court has subject matter jurisdiction under 28 U.S.C. § 1333(1), because this is a maritime case.  (See SAC (Dkt. No. 48) ¶ 3)

C.      **Enforceability of a Release Under New York Law**

         "In New York, settlement agreements must be construed according to general principles of contract law." Quinio v. Aala, 344 F. Supp. 3d 464, 471 (E.D.N.Y. 2018) (quotation omitted).  "'To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound.'" Id. (quoting Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 427 (2d Cir. 2004)).  Under New York law, courts consider extrinsic evidence to construe a release only if the plain text of the release is ambiguous.  See Alvarez v. Amicucci, 82 A.D.3d 687, 688 (2d Dept. 2011) (holding that a release that is "complete, clear, and unambiguous on its face must be enforced according to the plain meaning of its terms"; given the "clear, unambiguous language of the [release in that case], parol evidence [could not] be considered to vary or alter its terms"); accord Sharon v. 398 Bond St., LLC, 169 A.D.3d 1079, 1080 (2d Dept. 2019); Burgos v. New York Presbyterian Hosp., 155 A.D.3d 598, 600 (2d Dept. 2017).

         "'Generally, a valid release constitutes a complete bar to an action on a claim which is the subject of the release.'" Sharon, 169 A.D.3d at 1080 (quoting (Sicuranza v. Philip Howard Apts. Tenants Corp., 121 AD3d 966, 967 (2d Dept. 2014))   "'[A] signed release shifts the burden . . . going forward . . . to the [party releasing the claim] to show that there has been fraud, duress or some other fact which will be sufficient to void the release.'" Id. at 1081 (quoting Davis v. Rochdale Vil., Inc., 109 AD3d 867, 867 (2d Dept. 2013])).

1.      **Fraudulent inducement**

"Under New York law, to establish a claim for fraudulent inducement or fraud, a plaintiff must successfully allege '(1) a knowingly false representation of a material fact and (2) detrimental reliance thereon.  The false representation can be either a misrepresentation or the material omission of a fact.  Reliance means "reasonable" reliance.'"  Elite Physician Servs., LLC v. Citicorp Payment Servs., Inc., No. 06 CIV. 2447 (BSJ), 2009 WL 10669137, at *6 (S.D.N.Y. Oct. 9, 2009) (quoting Junk v. Aon Corp., No. 07 Civ. 4640, 2007 U.S. Dist. LEXIS 89741, at *18-19 (S.D.N.Y. Dec. 3, 2007))  "Evidence that [a party] is sophisticated and that [a party] was represented by counsel is relevant to the issue of reasonable reliance, but it is not dispositive of it."  Rekor Sys., Inc. v. Loughlin, No. 19-CV-7767 (LJL), 2022 WL 789157, at *7 (S.D.N.Y. Mar. 14, 2022) (citing Crigger v. Fahnestock & Co., 443 F.3d 230, 235 (2d Cir. 2006)).

A general disclaimer in which a party disclaims reliance on all prior representations, unlike a specific disclaimer that "'tracks the substance of the alleged misrepresentation,'" does not defeat a claim of fraud, but can be considered as evidence against that party's reasonable reliance on a pre-contractual representation.  Merrill Lynch & Co. v. Allegheny Energy, Inc., 382 F. Supp. 2d 411, 417 (S.D.N.Y. 2003) (quoting Caiola v. Citibank, N.A., 295 F.3d 312, 330 (2d Cir.2002); citing Harsco Corp. v. Segui, 91 F.3d 337, 345-46 (2d Cir. 1996)); see McBeth v. Porges, 171 F. Supp. 3d 216, 225 (S.D.N.Y. 2016) ("New York courts have routinely enforced merger and non-reliance clauses against sophisticated plaintiffs to deny extra-contractual claims that require a showing of reasonable reliance."); Elite Physician Servs., 2009 WL 10669137, at *8 (where a sophisticated party had signed an agreement with a general "merger clause [] intended to preclude either party from relying on previous statements,

written or oral," that party's "supposed reliance on [prior] representations simply could not be reasonable under [] New York . . . law").

Where a party asserting a fraud claim "'has the means of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations.'" Schlaifer Nance & Co. v. Est. of Warhol, 119 F.3d 91, 98 (2d Cir. 1997) (quoting Mallis v. Bankers Trust Co., 615 F.2d 68, 80-81 (2d Cir. 1980)); see Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1542 (2d Cir. 1997) (surveying New York case law and explaining that New York courts find reliance unreasonable where the "relevant facts" regarding a misrepresentation or omission "were easily accessible to the relying party"). Accordingly, "[a] plaintiff cannot establish justifiable reliance or a duty to disclose where the information at issue was a matter of public record that could have been discovered through the exercise of ordinary diligence." 246 Sears Rd. Realty Corp. v. Exxon Mobil Corp., No. 09-CV-889 NGG JMA, 2012 WL 4174862, at *14 (E.D.N.Y. Sept. 18, 2012). Similarly, "New York courts have determined as a matter of law that a party's reliance was unreasonable where the alleged misrepresentation is explicitly contradicted by the written agreement." Robinson v. Deutsche Bank Tr. Co. Americas, 572 F. Supp. 2d 319, 323 (S.D.N.Y. 2008).

### 2.   **Duress**

To state an economic duress defense, a defendant must establish "that there was: (1) a threat, (2) unlawfully made, (3) which caused involuntary acceptance of contractual terms, (4) because the circumstances permitted no alternative." U S W. Fin. Servs., Inc. v. Tollman, 786 F. Supp. 333, 338 (S.D.N.Y. 1992). "[A] threat to withhold performance that one is contractually obligated to provide in order to compel the other party to submit to new demands can constitute a wrongful threat." Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n, 655 F.3d

136, 142 (2d Cir. 2011) (citing <u>805 Third Ave. Co. v. M.W. Realty Assocs.</u>, 58 N.Y.2d 447, 451

(1983)).  "A party's threat to take action which it is legally entitled to take is not wrongful, nor is

a threat to insist upon one's legal rights." <u>Cont'l Airlines, Inc. v. Lelakis</u>, 943 F. Supp. 300, 307

(S.D.N.Y. 1996), <u>aff'd</u>, 129 F.3d 113 (2d Cir. 1997)  Moreover, "[t]he mere existence of

economic pressure does not constitute duress." <u>Id.</u>  "Under New York law, a party may not

prevail on an economic duress claim unless the party demonstrates that a breach of contract

action would have been impossible when the threat was made." <u>Nelson v. Stanley Blacker, Inc.</u>,

713 F. Supp. 107, 110 (S.D.N.Y. 1989 (citing <u>Gulf & Western Corp. v. Craftique Productions,</u>

<u>Inc.</u>, 523 F. Supp. 603 (S.D.N.Y.1981)).  Accordingly, a defendant seeking to assert a duress

defense must "demonstrate[] that he had no legal remedies available to avoid the alleged duress."

<u>Id.</u>

### 3.   <u>Material breach</u>

 "'As a general rule, rescission of a contract is permitted for such a breach as

substantially defeats its purpose.  It is not permitted for a slight, casual, or technical breach, but

only for such as are material and willful, or, if not willful, so substantial and fundamental as to

strongly tend to defeat the object of the parties in making the contract.'" <u>Willoughby Rehab. v.</u>

<u>Webster</u>, 134 A.D.3d 811, 813 (2d Dept. 2015) (quoting <u>RR Chester, LLC v. Arlington Bldg.</u>

<u>Corp.</u>, 22 A.D.3d 652, 654 (2d Dept. 2005).  "'Delay in performance of a contract where time is

not of the essence is not a material breach on which to base the equitable remedy of rescission.'"

<u>Id.</u> at 813–14 (quoting <u>Singh v. Carrington</u>, 18 A.D.3d 855, 857 (2d Dept. 2005)).

### D.   <u>The Voiding of Maritime Contracts for Material Misrepresentation</u>

Marine insurance contracts are subject to the maritime doctrine of <u>uberrimae</u> <u>fidei</u>,

or utmost good faith.  <u>See</u> <u>Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York</u>, 822 F.3d

620, 633 (2d Cir. 2016) (citing <u>Folksamerica Reinsurance Co. v. Clean Water of New York, Inc.</u>,

413 F.3d 307, 310 (2d Cir. 2005)).  Under that doctrine, "'the party seeking insurance is required to disclose all circumstances known to it which materially affect the risk' . . . . , [and] [f]ailure by the [insured] to disclose all available information will allow the insurer to avoid the policy, regardless of whether such omission is intentional or results from mistake, accident, forgetfulness, or inadvertence." Id. (quoting Folksamerica, 413 F.3d at 311) (further quotation omitted).  Although this doctrine imposes a lower intent threshold than that applicable in a non-maritime fraud or misrepresentation case, "'uberrimae fidei does not require the voiding of the contract unless the undisclosed facts were material and relied upon.'" Id. at 634 (quoting Puritan Ins. Co. v. Eagle S.S. Co. S.A., 779 F.2d 866, 871 (2d Cir. 1985)).

### 1.    Actual and apparent authority

Maritime law incorporates standard agency law principles, including that "[a]n agent can have actual authority, meaning explicit permission from the principal to act on its behalf, or apparent authority, by which the agent can affect the principal's legal relations with a third party when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc., 697 F.3d 59, 71 (2d Cir. 2012) (emphasis in original) (citing Rest. (3d) Agency § 2.01) (further quotation and citation omitted).  "Generally, the existence of either actual or apparent authority is a question of fact, revolving as it does around the actions by, and relationships between, principal, agent, and third parties." Id.  As to apparent authority, a party seeking to prove an agency relationship must point to actions of the principal that create "'the appearance of authority in the agent.'" Id. at 73 (quoting Herbert Constr. Co. v. Cont'l Ins. Co., 931 F.2d 989, 994 (2d Cir. 1991)).

III.   <u>ANALYSIS</u>

A.   <u>Great Lakes' Motion to Strike Heffner's Declaration</u>

On January 29, 2021, Herzig filed the declaration of his attorney, Adam Heffner, in support of Herzig's opposition to Great Lakes' motion for summary judgment.  (Def. R. 56.1 Stmt., Ex. 18 (Heffner Decl.) (Dkt. No. 108-19))  Heffner's declaration provides the only evidentiary support for Herzig's assertions that (1) "Goldman warned [Heffner] that, if Mr. Herzig did not accept [Great Lakes'] terms by the end of the workweek (which was <u>the next day</u>, December 30th), his insurance would be immediately cancelled, and Mr. Goldman would quickly advance the case filed against him"; and (2) "Goldman represented . . . that [the November 2016] [E]ndorsement was current and in place and applicable to the policy at issue in the parties' settlement negotiations."[11]  (<u>Id.</u> ¶¶ 18, 22 (emphasis in original))  These alleged statements by Goldman are central to Herzig's duress and fraud claims, respectively.

1.   **The Parties' Arguments Regarding the**
   **Admissibility of Heffner's Declaration**

After Herzig notified the Court of Heffner's death, this Court directed the parties to make supplemental submissions addressing whether Heffner's declaration should be considered in resolving Great Lakes' summary judgment motion.  (Dec. 22, 2022 Order (Dkt.

---

[11]  In his declaration, Herzig states that Heffner relayed certain of Goldman's alleged misrepresentations and threats to Herzig.  (<u>See</u> Def. R. 56.1 Stmt., Ex. 17 (Herzig Decl.) (Dkt. No. 108-18) ¶¶ 26-27, 30)  Herzig's statements about what Heffner told him about what Goldman told Heffner constitute hearsay, however, because these statements would be offered for the truth of the matter asserted – <u>i.e.</u>, that Goldman in fact made these misrepresentations and threats to Heffner.  <u>See</u> <u>Sarno v. Douglas Elliman-Gibbons & Ives, Inc.</u>, 183 F.3d 155, 160 (2d Cir. 1999) ("[affiant's] statement as to what he 'was told' was hearsay that would not be admissible at a trial," and therefore properly not considered on summary judgment); <u>Contemp. Mission, Inc. v. U.S. Postal Serv.</u>, 648 F.2d 97, 105 (2d Cir. 1981) (statement in affidavit by member of plaintiff religious organization that a third party had said that defendant "had once referred to plaintiff's members as 'crazy priests'" was an "offering of hearsay" that – at the summary judgment stage – could not be considered as evidence that defendant had engaged in "religious harassment").

No. 116) at 2)  The Court also directed the parties to "address (1) whether Heffner was listed as an 'individual likely to have discoverable information' in either party's initial disclosures pursuant to Federal Rule of Civil Procedure 26(a), and if not, why not; and (2) whether Heffner was deposed, and if not, why not."  (Id.)

Great Lakes argues that "the Heffner declaration should be stricken in its entirety" because (1) it would be inadmissible at trial for the reasons set forth in Gem Fin. Serv., Inc. v. City of New York, No. 13CV1686RPKRER, 2022 WL 409618, at *4-7 (E.D.N.Y. Feb. 10, 2022); and (2) Heffner's declaration "sheds no light on any fact or factor which is before this Court."  (Pltf. Mot. to Strike (Dkt. No. 118) ¶¶ 6, 10–11)  Great Lakes also states "that Mr. Heffner was not named or referenced as a potential witness anywhere nor at any time," and that accordingly Great Lakes never sought to depose Heffner.  (Id. ¶¶ 8–9)

Herzig contends that the Court should consider Heffner's declaration because it would be admissible at trial under the residual exception to the hearsay rule.  (Def. Opp. to Mot. to Strike (Dkt. No. 119) at 10-11 (citing Fed. R. Evid. 807))  Herzig also states that "Mr. Goldman named Mr. Heffner as a witness with knowledge in Plaintiff's Initial Disclosures on July 26, 2017."  (Id. at 5)  According to Herzig, Great Lakes' counsel "Goldman makes a blatant misrepresentation to this Court" about the Rule 26(a) disclosures, and "[t]his misrepresentation alone requires rejection of Plaintiff's submission."  (Id. at 5–6)

## 2.    Goldman's Misrepresentation Regarding the Rule 26(a) Disclosures

In its December 22, 2022 Order, this Court directed the parties to state in supplemental submissions "whether Heffner was listed as an 'individual likely to have discoverable information' in either party's initial disclosures."  (Dec. 22, 2022 Order (Dkt. No. 116) at 2)  Great Lakes' motion to strike states unequivocally that "Mr. Heffner was not named or referenced as a potential witness anywhere nor at any time."  (Pltf. Mot. to Strike (Dkt. No.

118) ¶ 8)  This representation to the Court is false.  Great Lakes itself – in a disclosure prepared by its counsel, Steven Goldman – identified Heffner as someone "believed to have knowledge of the facts which led to Plaintiff's coverage decision and the facts regarding settlement."  (Pltf. Rule 26(a) Disclosures (Dkt. No. 119) at 27, 29)  Accordingly, Goldman either lied to the Court about this fact or drafted his motion to strike without reviewing the disclosures that had been made, including the disclosure he had prepared.

Herzig contends that Plaintiff's statement that Heffner was never named as a witness with knowledge is a "blatant misrepresentation" that "cannot be a mistake because this Court specifically directed in its Order that the parties inform it about a discovery fact not on the docket."  (Def. Opp. to Mot. to Strike. (Dkt. No. 119) at 5-6)  Citing cases in which attorneys were disciplined for violating the duty of candor, Herzig argues that this Court should deny the motion to strike because of this apparent misrepresentation.  (Id. at 6 (citing Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., 328 F.R.D. 100, 103, 118 (S.D.N.Y. 2018); In re Gordon, 780 F.3d 156, 161 (2d Cir. 2015)))  Although Herzig does not use the word "sanction," this Court understands his argument to be that this Court should deny the motion to strike as a sanction for Goldman's misrepresentation.

This Court will determine the admissibility of Heffner's declaration on the merits. Otherwise inadmissible evidence will not be deemed admissible because the attorney for the party moving to strike made a misrepresentation to the Court about Rule 26(a) disclosures.[12]

---

[12]  The cases Herzig cites do not involve comparable facts and do not hold that admitting otherwise inadmissible evidence is an appropriate sanction for an attorney's misconduct.  See Syntel Sterling Best Shores Mauritius Ltd., 328 F.R.D. at 123-24 (denying motion for "sanctions of findings of fact, preclusion, or adverse inferences" for discovery misconduct but ordering monetary sanctions and the reopening of discovery at the offending party's expense); Gordon, 780 F.3d at 161-62 (ordering public reprimand and two-month suspension from practice as a sanction for lying to a disciplinary committee).

### 3.    Whether Heffner's Declaration is Admissible Under the Residual Exception to the Hearsay Rule

Federal Rule of Evidence 807 provides:

(a) In General.  Under the following conditions, a hearsay statement is not excluded by the rule against hearsay even if the statement is not admissible under a hearsay exception in Rule 803 or 804:

  (1) the statement is supported by sufficient guarantees of trustworthiness – after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and

  (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

(b) Notice.  The statement is admissible only if the proponent gives an adverse party reasonable notice of the intent to offer the statement – including its substance and the declarant's name – so that the party has a fair opportunity to meet it.  The notice must be provided in writing before the trial or hearing – or in any form during the trial or hearing if the court, for good cause, excuses a lack of earlier notice.

Fed. R. Evid. 807.

The Second Circuit has explained that

"[Rule 807] permits admission of hearsay if (i) it is particularly trustworthy; (ii) it bears on a material fact; (iii) it is the most probative evidence addressing that fact; (iv) its admission is consistent with the rules of evidence and advances the interests of justice; and (v) its proffer follows adequate notice to the adverse party."

United States v. Dawkins, 999 F.3d 767, 791 (2d Cir. 2021) (quoting United States v. Bryce, 208 F.3d 346, 350 (2d Cir. 1999) (alterations in Dawkins).  The Second Circuit has instructed that the residual exception is to be used "very rarely, and only in exceptional circumstances."  Parsons v. Honeywell, 929 F.2d 901, 907 (2d Cir. 1991) (quotation omitted).

a.   **Application**

Heffner's declaration plainly addresses material facts, and – as discussed above – Great Lakes was well aware that Heffner was a person with knowledge of material facts. As to trustworthiness, however, Heffner's declaration presents reliability issues.

As an initial matter – in submitting his declaration – Heffner was acting both as a fact witness and as a lawyer who was attempting to persuade the Court to deny a summary judgment motion brought against his client. Moreover, in his declaration, Heffner (1) makes factual allegations critical to Herzig's duress defense – allegations that, if true, would likely have been disclosed much earlier in this litigation; and (2) provides an account that is uncorroborated and not credible given the sequence of events.

In his declaration, Heffner asserts that Goldman orally presented an "exploding offer" that is not referenced in any of the written correspondence. Heffner states that "Goldman warned [Heffner] that, if Mr. Herzig did not accept [Great Lakes'] terms by the end of the workweek (which was the next day, December 30th), his insurance would be immediately cancelled, and Mr. Goldman would quickly advance the case filed against him." [13] (Def. R. 56.1 Stmt., Ex. 18 (Heffner Decl.) (Dkt. No. 108-19) ¶ 18 (emphasis in original))

While Goldman warns Heffner in a December 29, 2016 email that Great Lakes is making a "final settlement offer," and that Herzig's "[r]ejection of . . . [the] offer will result in the immediate cancellation of [the Policy]," Goldman sets no deadline for Herzig to decide whether to accept the offer. The oral threat that Heffner describes in his declaration is very

---

[13]  As discussed above, Herzig's statements that Heffner relayed certain of Goldman's alleged misrepresentations and threats to Herzig (Def. R. 56.1 Stmt., Ex. 17 (Herzig Decl. (Dkt. No. 108-18) ¶¶ 26-27, 30) are inadmissible hearsay if offered to prove that Goldman made those misrepresentations and threats to Heffner. See Sarno, 183 F.3d at 160; Contemp. Mission, Inc., 648 F.2d at 105.

different:  Great Lakes gives Herzig one day to decide whether to accept its offer, failing which insurance coverage for the Crescendo will be cancelled.  (Pltf. R. 56.1 Stmt., Ex. 18 (Heffner Decl. (Dkt. No. 108-19) ¶¶ 18, 22)

The "exploding offer" described by Heffner likewise does not appear in any of Herzig's prior filings.

For example, Herzig's July 2, 2018 Answer to the SAC (Dkt. No. 49) sets forth numerous affirmative defenses and counterclaims, and includes a detailed recitation of the communications between Heffner and Goldman.  But the Answer says nothing about Goldman's alleged December 29, 2016 oral "exploding offer."

On November 22, 2019, Herzig moved to amend his answer to include an affirmative defense of economic duress.  (Dkt. No. 80)  In that motion, as here, Herzig argues that

> [t]he economic risk to Herzig from the threat of immediate loss of coverage caused him to enter into a Policyholder's Release with Great Lakes . . . agreeing to Great Lakes' terms.  When entering into the Release, Herzig believed he had no choice – failure to enter [into the Release] would lead to immediate cancellation of his insurance policy and would prevent him from continuing to dock his Vessel in any South Florida ports or obtain the services or professional marine crew to help move the badly damaged Vessel in the event a port could be found outside South Florida . . . . Great Lakes' threat of immediate termination of coverage was unlawful.  The Policy covering the Vessel expressly required a 10-day notice period prior to cancellation.

(Def. Leave to Amend Br. (Dkt. No. 81) at 4-5 (emphasis in original))

In support of his motion for leave to amend, Herzig cites the same December 28-29 email correspondence discussed above and attached as Exhibit G to Defendant's Local Rule 56.1 statement.  (Dkt. No. 81 at 4 (citing Dkt. No. 64-15); compare Def. R. 56.1 Stmt., Ex. G (Dkt. No. 108-8))  Herzig's motion to amend does not mention Goldman's alleged December 29, 2016 oral threat to cancel the insurance the next day if Herzig did not accept Great Lakes'

settlement offer.  Obviously, if such a threat had been made, that would have been highly

relevant to Herzig's motion.  Nor did Herzig refer to any such threat in his reply brief, despite

Great Lakes' argument that Herzig had not alleged facts suggesting that Great Lakes had set any

deadline for Herzig to respond to its settlement offer.  (See Pltf. Opp. to Mot. to Amend (Dkt.

No. 85) at 5)

   This Court denied Defendant's motion for leave to amend, holding that

amendment would be futile because the proposed affirmative defense of duress would be futile –

i.e., would not survive a motion to strike.  (Aug. 25, 2020 Order (Dkt. No. 86) at 9)  Among

other things, this Court held that, based on the email evidence, Great Lakes had not made an

unlawful threat:

> Herzig . . . contends that Great Lakes insisted that Herzig respond to its settlement
> offer "immediately," failing which the Policy would be cancelled.  (Def. Reply
> Br. (Dkt. No. 83) at 5-6 (the "time to respond was set: 'immediately'"))  There is
> no such evidence.  Although Great Lakes' attorney stated in a December 29, 2016
> email that he "await[ed] [Herzig's] anticipated acceptance of [the proposed
> settlement's] terms ASAP," Great Lakes did not set a time limit for Herzig to
> respond to its settlement offer.  (Dec. 29, 2016 Great Lakes email (Dkt. No. 64-
> 15) at 2)  Indeed, in the same December 29, 2016 communication, Great Lakes
> references the fact that the Court had scheduled a pretrial conference for April 6,
> 2017 – more than three months distant.  In short, Great Lakes did not demand that
> Herzig accept its settlement offer "immediately," nor did it set a deadline for
> Herzig to accept its settlement offer.  Given that Great Lakes set no explicit
> deadline for Herzig's acceptance of its settlement proposal, Herzig cannot
> plausibly claim that the settlement offer left him with no alternative but to accept
> it immediately.

(Id. at 7)

   The Heffner declaration was filed on January 29, 2021, about five months after

this Court denied Herzig's motion for leave to amend, and was submitted in opposition to Great

Lakes' motion for summary judgment.  Heffner's new allegations regarding Goldman's oral

threat of cancellation and the "exploding offer" appear designed to remedy the defect in proof

cited by this Court in denying Herzig's motion to amend.  There is no explanation why these

highly relevant factual allegations were not included in Herzig's answer or in his moving papers in support of his motion to amend, especially after Great Lakes argued in its opposition that Herzig had not offered any evidence of a deadline for responding to Great Lakes' settlement offer.  Given Great Lakes' argument that Herzig had offered no evidence suggesting that the cancellation of insurance coverage for the Crescendo was imminent, it is logical that – if the "exploding offer" had actually taken place – Herzig would have asserted this fact in his reply.

Heffner also states in his declaration that "Goldman represented" in a phone call "that [the November 2016] [E]ndorsement was current and in place and applicable to the policy at issue in the parties' settlement negotiations."  (Def. R. 56.1 Stmt., Ex. 18 (Heffner Decl.) (Dkt. No. 108-19) ¶ 22)  This statement is likewise unreliable.  When Goldman emailed the November 2016 Endorsement to Heffner, Goldman described it as "dated November 18, 2016" in the cover email.  Goldman also attached a copy of the Endorsement, which states on the first page that it is "with effect from Friday, November 18, 2016."  (Def. R. 56.1 Stmt., Ex. G (Dkt. No. 108-8) at 2; Nov. 2016 Endorsement Attached to Email (Dkt. No. 117) at 6)  Aside from Heffner's declaration, there is no evidence that Goldman – contrary to the email correspondence and the Endorsement itself – told Heffner that it applied retroactively to Herzig's October 2016 claim.  In sum, Heffner's statement that Goldman described the Endorsement as "current and in place and applicable to the policy at issue in the parties' settlement negotiations" (1) contradicts the written evidence in the record and (2) is uncorroborated.  As such, the statement is not "supported by sufficient guarantees of trustworthiness – after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement."  Fed. R. Evid. 807(a)(1).

Separate and apart from the circumstances in which the Heffner declaration was offered and the lack of corroboration, Heffner's relationship with Herzig and his role as Herzig's

lawyer in this action weigh against a finding of trustworthiness.  Heffner advocated for Herzig

and negotiated on his behalf after the Complaint was filed.  He also had a twelve-year

relationship with Herzig and had represented him in two earlier matters.  (See Herzig Dep. Part 1

(Dkt. No. 99) at 22-23 (Herzig stating that he had known Heffner for "[a]pproximately 12 years"

and that Heffner had represented him in two prior matters before the instant case))  Given this

relationship and Heffner's role in the proceedings – which was as an advocate attempting to

defeat claims brought against his client – Heffner was not a disinterested witness.  It is thus

unlikely that his declaration depicts the negotiations with Goldman in a neutral and evenhanded

manner.  See Gem Fin. Servs., 2022 WL 409618, at *1, *5-6 (holding that declarant's long

service as plaintiff's counsel weighed against a finding of trustworthiness); Wade v. New York

Tel. Co., 500 F. Supp. 1170, 1176 (S.D.N.Y. 1980) ("Under Rule 56, unsupported allegations of

counsel may be disregarded in determining whether genuine issues of fact exist to be tried.");

Inglett & Co. v. Everglades Fertilizer Co., 255 F.2d 342, 349 (5th Cir. 1958) ("We consider it a

tribute to the high calling of advocacy to say that we think it an unnatural, if not virtually

impossible, task for counsel, in his own case, to drop his garments of advocacy and take on the

somber garb of an objective fact-stater.").

   In sum, the Heffner declaration contains new and highly relevant factual

allegations that appear designed to address a defect in the proof cited in one of this Court's

earlier decisions.  No explanation has been offered as to why this alleged highly relevant

information – which was available to Herzig from the outset of this case – was not presented to

the Court earlier.  The new facts are uncorroborated, and were offered by Herzig's advocate and

lawyer in this matter "for the purpose of advancing [Herzig's] interests during this litigation."

Gem Fin. Servs., 2022 WL 409618, at *5.  Given these circumstances, this Court cannot find that

the Heffner declaration is "particularly trustworthy" within the meaning of Fed. R. Evid. 807.
See id. at *5-6 (holding that an affidavit from a party's deceased former senior vice president for
legal matters that was uncorroborated and appeared designed to address a defect in the proof at
summary judgment was not "particularly trustworthy" under Fed. R. Evid. 807).

        The Court further finds that the Heffner declaration is not the most probative
evidence concerning Goldman and Heffner's settlement negotiations.  Heffner and Goldman
exchanged letters and negotiated in a lengthy email thread.  (Def. R. 56.1 Stmt. (Dkt. No. 108) ¶¶
105-10)  These written communications are highly probative of what Goldman said during the
negotiations.  And although the Heffner declaration purports to document phone calls between
the two, it is not the sole source for what was said on those calls, because both Heffner and
Goldman memorialized important points from the calls in their emails.  (See Def. R. 56.1 Stmt.,
Ex. G (Dkt. No. 108-8) at 4 (Heffner stating, "Please allow this to confirm our telephone
conversation. . . ."); Ex. N (Dkt. No. 108-15) at 2 (Goldman using the phrase "[a]s I advised" in
an apparent reference to a point he had made in a phone call))

        As to the interests of justice – as discussed above – there are reasons to question
the veracity of the Heffner declaration, which is unsworn and is not subject to challenge through
cross-examination.  See Rekor Sys., 2022 WL 789157, at *8 (affording no weight to the
declarations of "interested parties [who], at the time of the motion for summary judgment, . . .
had not been subject to deposition").  The Court concludes that the admission of the Heffner
declaration would not aid in "ascertaining the truth and securing a just determination."  Fed. R.
Evid. 102.

Finally, Herzig has not cited, and the Court has not found, any case in this Circuit admitting an attorney's affidavit or declaration that contains uncorroborated factual allegations as to a material point.

Herzig's arguments in favor of admitting the Heffner declaration are not persuasive.

Herzig first argues that the Heffner declaration is trustworthy because Heffner was an attorney subject to court discipline. (Def. Opp. to Mot. to Strike (Dkt. No. 119) at 11) As discussed above, however, Heffner's role as an advocate undermines rather than strengthens the claim of trustworthiness, because an attorney-advocate is not a disinterested witness. And while the Heffner declaration was submitted under penalty of perjury, the standard for admissibility under the residual exception is whether the proffered evidence is "particularly trustworthy," Dawkins, 999 F.3d at 791, not whether the statement was submitted under penalty of perjury. Moreover, a statement made in a declaration under penalty of perjury is not the equivalent of "an oath in open court before a jury and during a public proceeding." Gem Fin. Servs., 2022 WL 409618, at *6.

Herzig argues, however, that the Heffner declaration "contains material, probative facts based on his personal knowledge, providing his recollection of the pivotal communications and discussions with Mr. Goldman that ultimately induced Mr. Herzig to agree to a low-ball settlement." (Def. Opp. to Mot. to Strike (Dkt. No. 119) at 12) That the Heffner declaration addresses relevant matters is not sufficient, however. To be admissible under the residual exception, the evidence at issue must be "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a)(2). As explained above, given the extensive written record of Goldman and Heffner's

settlement negotiations, the Heffner declaration is not the most probative evidence concerning their communications.

Herzig further argues that admitting the Heffner declaration would advance the interests of justice because (1) Herzig, as the non-movant, "is entitled to introduce all relevant evidence to show that material facts are genuinely disputed, in order to move forward to trial," and "[e]very favorable inference should be afforded such evidence"; (2) the Heffner declaration was admissible when submitted to the Court on January 29, 2021, in connection with Herzig's opposition to Great Lakes' summary judgment motion; and (3) the only other person with direct knowledge of what Goldman said to Heffner is Goldman himself, who is serving as "one of the only persons with direct knowledge of events . . . in violation of the prohibition [on] the same person acting as lawyer and witness" and who "affirmatively misrepresented the procedural facts responding to the questions in the Court's Order."  (Def. Opp. to Mot. to Strike (Dkt. No. 119) at 16)

Herzig's arguments are not persuasive.  As discussed above, where there are conflicting characterizations of the facts, Herzig – as the non-movant – is entitled to a favorable inference.  But that provides no basis for ignoring the Federal Rules.  Federal Rule of Civil Procedure 56(c)(4) provides that a statement "used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Id. As discussed above, Heffner's declaration is not admissible other than through application of Fed. R. Evid. 807, and the declaration does not meet the standards for admissibility under that rule.  And as to Goldman's misrepresentation regarding Rule 26(a) disclosures, as explained above, admitting otherwise inadmissible evidence is not an appropriate sanction here.

Herzig also argues that Great Lakes waived any objection to admission of the Heffner declaration because it "never sought to depose Mr. Heffner and never objected to his Declaration, even after being informed of his death.  Plaintiff threw together a position on this issue only in response to the Court's Order."  (Def. Opp. to Mot. to Strike (Dkt. No. 119) at 17) But Great Lakes submitted its motion to strike by the deadline set out in the Court's scheduling order, and Herzig does not explain how he was prejudiced by the delay between Great Lakes learning of Heffner's death and its motion to strike his declaration.  And while Great Lakes chose not to depose Heffner, it did not thereby waive any objection to the admissibility of his declaration.

Finally, the cases Herzig cites concerning the admissibility of declarations and affidavits under the residual exception (see Def. Opp. to Mot. to Strike (Dkt. No. 119) at 10-14) are distinguishable.  See Cont'l Indus. Grp. v. Altunkilic, No. 14-CV-790 (AT) (JLC), 2020 WL 3884312, at *6 (S.D.N.Y. July 1, 2020) (default judgment inquest Report and Recommendation considering affidavit of individual who was available to testify; affiant's statements concerning lost profits were trustworthy because they were against his company's interest); Sellers v. Nationwide Mut. Fire Ins. Co., No. 2:15-CV-957-KOB, 2018 WL 1174482, at *3 (N.D. Ala. Mar. 6, 2018) (stating that "an affiant's death alone does not necessarily render her sworn testimony inadmissible" but noting that the court "[would] only consider [the challenged affidavits] in a manner consistent with the Federal Rules of Evidence"); Steinberg v. Obstetrics-Gynecological & Infertility Grp., P.C., 260 F. Supp. 2d 492, 494-98 (D. Conn. 2003) (holding that a letter between co-counsel regarding the futility of further ERISA administrative proceedings was trustworthy); Lopez v. Miller, 915 F. Supp. 2d 373, 423-26 (E.D.N.Y. 2013) (two alibi witnesses' affidavits were corroborated by their similarity to each other); Common

Cause/New York v. Brehm, 432 F. Supp. 3d 285, 288 n.1 (S.D.N.Y. 2020) (in a voting rights

case, deceased voter's declaration was corroborated by like statements from other voters);

Bohler-Uddeholm Am., Inc. v. Ellwood Grp., 247 F.3d 79, 112-13 (3d Cir. 2001) (district court

did not abuse its discretion in admitting portions of the affidavit of decedent – the former

president of plaintiff company – who was the only attendee from plaintiff at meetings with

defendant company, and thus the only source of evidence for rebutting defendant company's

claims regarding a course of dealing).  None of these cases involves an uncorroborated

declaration by a party's lawyer.

*      *      *      *

The Court concludes that the Heffner declaration contains hearsay statements that

are not admissible under the residual exception.  Accordingly, Great Lakes' motion to strike the

declaration will be granted.  This Court will likewise not consider any of the corresponding

paragraphs of the Herzig declaration, in which Herzig reports what Heffner told him about what

Goldman had said.

### B.      Whether the Release Is Valid and Enforceable

It is undisputed that Herzig accepted Great Lakes' proposal that he execute a

release in exchange for $175,000 and 30 days' insurance coverage, and that he signified his

agreement by executing the Release.  Accordingly, Great Lakes has established a prima facie

case that the Release is an enforceable contract.  Herzig argues, however, that the Release is

rendered unenforceable by virtue of fraudulent inducement, economic duress, and prior material

breach.

### 1. Whether Great Lakes Fraudulently Induced Herzig to Enter Into the Release

Herzig claims that Great Lakes made three material misrepresentations on which he relied in entering into the Release:  (1) "that, on November 18, 2016, Plaintiff executed a valid endorsement that reduced coverage on Crescendo to $300,000"; (2) "that the endorsement was current and applicable to Herzig's pending claim"; and (3) "that Herzig's broker had already been credited a return of premium."  (Def. Opp. (Dkt. No. 106) at 25)

### a. Whether Herzig Reasonably Relied on Great Lakes' Alleged Misrepresentation that the November 2016 Endorsement Was in Effect

Herzig argues that the November 2016 Endorsement was invalid when Concept issued it because (1) Great Lakes had no right to unilaterally amend the terms of the Policy; and (2) the Endorsement was not approved by the Excess Line Association of New York.  Therefore, when Goldman allegedly represented during negotiations with Heffner that the November 2016 Endorsement was in effect, and had reduced the value of the Crescendo – and thus the limit of its insurance coverage – to $300,000, that representation was false, and Herzig relied on this misrepresentation in entering into the Release.

Herzig contends that the November 2016 Endorsement was invalid when issued "because – as provided under the [P]olicy – [Great Lakes] could not modify or amend the [P]olicy unilaterally."  (Def. Opp. (Dkt. No. 106) at 25)  In support of this argument, Herzig cites the Policy as well as deposition testimony from Concept's Usher.  When asked at deposition what provision of the Policy permitted Great Lakes to reduce the value of the Policy unilaterally, Usher could not cite any such provision.  (Pltf. R. 56.1 Stmt., Ex. K (Dkt. No. 109-11); Usher Dep. (Dkt. No 97) at 28 (internal page and line numbering 100:16–101:21))  The Policy does not explicitly authorize the insurer to reduce the asset value without the insured's agreement, and

Herzig contends that changing the coverage amount via endorsement was a material alteration requiring the consent of both parties.  See 2 Couch on Ins. §§ 25:17, 25:24 (3d ed. Nov. 2022 update) (explaining that a change in coverage is the type of modification to a policy that requires the consent of both parties).

The evidence indicates that neither Concept nor Great Lakes requested or obtained Herzig's consent to the November 2016 Endorsement.  To the contrary, Concept decided to "just go ahead and do it."  (Def. R. 56.1 Stmt. (Dkt. No. 108) ¶ 99)  And there is no evidence that Herzig ever ratified or consented to the November 2016 Endorsement.

In a declaration, Herzig's broker at Crystal – John Poplawsky – states that, while he received the November 2016 Endorsement from Quaker on the day it was issued, it lacked an approval stamp from the Excess Line Association, which meant that it was not yet valid.[14] Poplawsky did not receive a properly stamped version of the Endorsement until January 3, 2017, after Herzig executed the December 29, 2016 Release.  (Def. R. 56.1 Stmt., Ex. 23 (Poplawsky Decl.) (Dkt. No. 108-24) ¶¶ 8-11)

This Court concludes that there is a material issue of fact as to (1) the validity of the November 2016 Endorsement at the time that Herzig executed the Release; and (2) whether Great Lakes' agent – Goldman – misrepresented to Heffner that the November 2016 Endorsement was in effect at the time that Herzig executed the Release.

Because Herzig agreed to execute the Release only after Goldman called Heffner's attention to the November 2016 Endorsement (see Def. R. 56.1 Stmt. (Dkt. No. 108)

---

[14]  Although neither party discusses the applicable legal authority, N.Y. Insurance Law § 2118(b)(6) provides that "[i]t shall be unlawful for a licensee [of excess lines insurance] to deliver in this state any declarations page of an insurance policy or cover note evidencing insurance unless such insurance document is stamped by the excess line association or is exempt from such requirements. . . ."

¶¶ 109, 111), and because Herzig represents in his declaration states that the November 2016 Endorsement affected how he valued his claim (Def. R. 56.1 Stmt., Ex. 17 (Herzig Decl.) (Dkt. No. 108-18) ¶ 31), it is a reasonable inference that the purported existence of a validly issued November 2016 Endorsement influenced Herzig's decision to execute the Release. Therefore, there is a material issue of fact as to whether Herzig relied on Goldman's representation about the November 2016 Endorsement.

This Court must thus consider whether Herzig's alleged reliance on Goldman's representation that the November 2016 Endorsement was in place was reasonable. Herzig offers two reasons why the Endorsement was invalid at the time he signed the Release: (1) Great Lakes was not authorized to unilaterally reduce the asset value and coverage amount of the Policy; and (2) the Endorsement had not yet been stamped by the Excess Line Association. The facts and legal doctrines underlying both of these matters, however, were either known to Herzig at the time he executed the Release or were readily discoverable by him. That the Policy does not explicitly authorize Great Lakes to unilaterally reduce the asset value and coverage amount is evident from the face of the Policy. The legal rule prohibiting unilateral material changes to insurance policies is also well established in the law. See Danzig v. Dikman, 78 A.D.2d 303, 305-06, 309 (1st Dept. 1980) (holding that "the modification [to a group health insurance policy] changing the lifetime maximum for expenses for private duty nursing care from 'unlimited' to $5000 [was] ineffective" because the insurer had not "obtain[ed] the consent of [the insureds] to such modification"), aff'd, 53 N.Y.2d 926 (1981). Similarly, Herzig's broker at Crystal was aware that the Endorsement was not stamped and was thus not yet valid under well-established New York law. (Def. R. 56.1 Stmt., Ex. 23 (Poplawsky Decl.) (Dkt. No. 108-24) ¶ 9) See N.Y. Ins. Law § 2118(b)(6). Herzig himself received the unstamped November 2016 Endorsement on

December 29, 2016, and was, of course, well aware that he had not consented to the November 2016 Endorsement.  (See Def. R. 56.1 Stmt., Ex. 17 (Herzig Decl.) (Dkt. No. 108-18) ¶ 29 ("I was completely unaware of the endorsement."))

Because Herzig either knew or could have easily discovered the facts and legal doctrines relevant to Goldman's alleged misrepresentation that the November 2016 Endorsement was in place, it was not reasonable for Herzig to rely on Goldman's alleged statement that the Endorsement was in effect.  See Schlaifer Nance & Co., 119 F.3d at 98 (holding that where a party alleging fraud "'has the means of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations'") (quoting Mallis, 615 F.2d at 80-81).

The Court concludes that Herzig has not presented a material issue of fact as to whether he was defrauded by Goldman's alleged misrepresentation that the November 2016 Endorsement was in effect at the time that Herzig signed the Release.

### b.   Whether Herzig Reasonably Relied on Great Lakes' Alleged Misrepresentation that the November 2016 Endorsement was Retroactive to Herzig's October 2016 Claim

Herzig contends that Goldman misrepresented "that the [November 2016] [E]ndorsement was current and applicable to Herzig's pending claim."  (Def. Opp. (Dkt. No. 106) at 25):

> If I [had known], prior to signing the release, that the purported endorsement reducing my policy in half [from $600,000 to $300,000] was not valid and that no premium had been returned, or at least [had known] that the purported endorsement did not apply to my pending insurance claim, I would not have signed the release as the amount in dispute would have been $425,000 instead of $125,000 and that is a significant sum to abandon and could have made the cost of self-insurance worth pursuing.

43

(Def. R. 56.1 Stmt., Ex. 17 (Herzig. Decl.) (Dkt. No. 108-18) ¶ 34)[15]

   The only evidence supporting Herzig's claim that Goldman told Heffner that the

November 2016 Endorsement was retroactive is the stricken Heffner declaration.  In his

declaration, Heffner states that when he called Goldman about the November 2016 Endorsement,

> Mr. Goldman represented that his client had already credited a premium payment
> back to Mr. Herzig's insurance broker. . . . It seemed reasonable to me that such
> credit would not have been issued had the endorsement been prospective only.
> Indeed, Mr. Goldman never indicated that the purported change in value to the
> policy was prospective only and had no effect on Mr. Herzig's pending claim.
> Rather, Mr. Goldman represented, and based on what I understood, that the
> endorsement was current and in place and applicable to the policy at issue in the
> parties' settlement negotiations. That is, that the existing policy limit was not
> $600,000 but instead $300,000.

(Def. R. 56.1 Stmt., Ex. 18 (Heffner Decl.) (Dkt. No. 108-19) ¶ 22)[16]

   Absent the stricken Heffner declaration, there is no evidence that Goldman ever

told Heffner that the November 2016 Endorsement was retroactive.  In the December 29, 2016

email to Heffner in which Goldman provides and describes the November 2016 Endorsement,

Goldman does not mention retroactivity.  He instead states that the November 2016 Endorsement

will apply "[d]uring the 30 days of continued coverage" and is "dated November 18, 2016."

(Def. R. 56.1 Stmt., Ex. G (Dkt. No. 108-8) at 2)

---

[15] Great Lakes cites the deposition testimony of Concept's Usher to argue that "it was always
made clear that the reduction in the vessel value was post-incident only and had absolutely no
impact whatsoever on the dollar value or the resolution of Herzig's claim."  (Pltf. Reply Br. (Dkt.
No. 111) at 7 (emphasis in original))  This testimony is entitled to no weight, however, because
while Usher was involved in drafting the November 2016 Endorsement (see Def. R. 56.1 Stmt.
(Dkt. No. 108) ¶ 99), he was not involved in, and lacks personal knowledge of, how Goldman
characterized the November 2016 Endorsement in his negotiations with Heffner.

[16] Herzig also states that Heffner "relayed . . . Goldman's representation" about the retroactive
nature of the November 2016 Endorsement to him.  (Def. R. 56.1 Stmt., Ex. 17 (Herzig. Decl.)
(Dkt. No. 108-18) ¶ 30)  As discussed above, however, Herzig's statements about what Heffner
told him about what Goldman had said are not admissible for the truth of whether Goldman in
fact made such representations to Heffner.  See Fed. R. Evid. 801.

Even if the Heffner declaration were admissible on the issue of whether Goldman represented that the November 2016 Endorsement applied retroactively to Herzig's October 2016 claim, it would not have been reasonable for Herzig to rely on that representation.  Herzig had a copy of the November 2016 Endorsement, which makes clear that it is not retroactive.  The first page of the Endorsement reflects an execution date of November 18, 2016, and states that it is "with effect from Friday, November 18, 2016."  (Nov. 2016 Endorsement Attached to Email (Dkt. No. 117) at 6)  Moreover, nothing in the Endorsement suggests that it has retroactive application.  Accordingly, any suggestion by Goldman that the Endorsement had retroactive application back to October 2016 would have contradicted the plain text of the Endorsement. There is no reasonable reliance where a party relies on an alleged oral misrepresentation about a document where that statement contradicts the document itself.  See Robinson, 572 F. Supp. 2d at 323 ("New York courts have determined as a matter of law that a party's reliance was unreasonable where the alleged misrepresentation is explicitly contradicted by the written agreement."); Compania Sud-Americana de Vapores, S.A. v. IBJ Schroder Bank & Tr. Co., 785 F. Supp. 411, 419-21 (S.D.N.Y. 1992) (holding "as a matter of law, that [plaintiff's] reliance on [defendant bank's] alleged misrepresentations was unreasonable" where (1) plaintiff's "claim [was] based upon the difference between the rate charged by [defendant bank] and the interbank rate . . . allegedly promised by [defendant bank to plaintiff]"; and (2) "[a]t all relevant times, [plaintiff banking client] had access to both relevant rates . . . .  [because] [t]he rate charged by [defendant bank] was confirmed in writing to [plaintiff] . . . and the interbank foreign exchange rates were available in daily newspapers"); Marine Midland Bank v. Palm Beach Moorings, Inc., 61 A.D.2d 927 (1st Dept. 1978) (affirming grant of summary judgment to plaintiff bank regarding defendant's obligation to bank because – although defendant argued that a "vice

president of the plaintiff bank" had made oral misrepresentations to induce defendant to contract – "it [was] not denied that the defendant . . . had the opportunity to examine the [plaintiff bank's] corporate records before assuming the obligations reflected in the agreement").

Heffner's statement in his declaration that "[i]t seemed reasonable to [him] that [the premium] credit would not have been issued had the endorsement been prospective only" – and Herzig's similar assertion in his declaration – likewise do not establish reasonable reliance. (Def. R. 56.1 Stmt., Ex. 18 (Heffner Decl.) (Dkt. No. 108-19) ¶ 22; Def. R. 56.1 Stmt., Ex. 17 (Herzig. Decl.) (Dkt. No. 108-18) ¶ 30)  To the extent that Herzig inferred from the premium credit that the November 2016 Endorsement applied retroactively to an October 2016 claim, that inference was not reasonable.  There is no evidence suggesting that the premium credit relates in any fashion to coverage for the month of October 2016.  Moreover, neither Herzig nor Heffner explain why they believed that was the case, nor do they allege any statement by Goldman suggesting that the premium credit related to coverage for October 2016.

The Court concludes that Herzig has not raised a material issue of fact as to whether he was defrauded in connection with Goldman's alleged misrepresentation that the November 2016 Endorsement applied retroactively.

### c. Whether Herzig Reasonably Relied on Great Lakes' Alleged Misrepresentation that Great Lakes Had Issued a Refund to Herzig's Broker

Herzig also contends that he relied on Goldman's misrepresentation "that Herzig's broker had already been credited a return of premium."  (Def. Opp. (Dkt. No. 106) at 25)

It is undisputed that (1) Goldman represented during the December 2016 negotiations with Heffner that the return of premium had already been credited to Herzig's

insurance broker; and (2) the return of premium was not credited to Herzig's broker, Crystal, until January 2017.  (Def. R. 56.1 Stmt. (Dkt. No. 108) ¶¶ 110, 113)  Accordingly, this Court must consider whether Herzig reasonably relied on Goldman's misrepresentation.[17]

The undisputed evidence demonstrates that Herzig did not rely on any representation from Goldman that his broker's account had been credited for a return of premium.  The evidence on this point is as follows:

As discussed above, in a December 29, 2016, 9:40 a.m. email, Goldman sent the November 2016 Endorsement to Heffner as an attachment.  (Def. R. 56.1 Stmt. (Dkt. No. 108) ¶ 109; Ex. G. (Dkt. No. 108-8) at 2)  While the email itself does not mention a return of premium, the November 2016 Endorsement states that "a Return Premium of US $1,954 is due."  (Nov. 2016 Endorsement Attached to Email (Dkt. No. 117) at 6)  Heffner and Goldman subsequently spoke by phone about the return of premium.  The substance of that conversation is reflected in Goldman's email to Heffner later that day, in which Goldman states:  "As I advised, the return premium in the amount of $1,954.00 was credited back to your client's broker."  (Id., Ex. N (Dkt. No. 108-15) at 2)

At 11:21 a.m. that day, Heffner sent the following email to Goldman:

> Please be advised that my client is signing the release and I will email you the executed document shortly.  The original will follow [b]y mail.  Please overnight the settlement check. . . . Additionally, pursuant to [the November 2016

---

[17]  Great Lakes argues that Goldman's representation was true, because Concept had "remitted funds back to Quaker Special Risks, Ltd., the surplus lines broker acting for the Assured, and as such the broker with which it was in direct contact."  (Pltf. Reply Br. (Dkt. No. 111) at 7-8)  However, neither Great Lakes' Local Rule 56.1 statement nor any declaration or affidavit in support of Great Lakes' motion for summary judgment indicates when any such transfer of funds to Quaker took place.  In any event, as explained below, there is a material issue of fact as to whether Quaker was in fact a "broker acting for the Assured" – i.e., Herzig.  Accordingly, it is not clear that, even if Quaker received the funds before the settlement negotiations at issue, Goldman's claim that a return premium had been "credited back to [Herzig's] broker" (Def. R. 56.1 Stmt., Ex. N (Dkt. No. 108-15) at 2) was accurate.

Endorsement], which my [client] had never seen before, a return in premium is due my client in the amount of $1,954.00. Please inquire as to the status of this as my client has never received it.

(Id.)

This email demonstrates that Herzig was uncertain as to the status of the return of premium payment at the time he agreed to sign the Release, but was nonetheless willing to sign the Release. Herzig thus did not rely on Goldman's statement that Herzig's broker had already been credited for the return of premium.

Even if Herzig had relied on Goldman's misrepresentation concerning the return of premium, however, any such reliance would not have been reasonable. According to Herzig, the significance of the premium credit was that it indicated to him that the November 2016 Endorsement was valid. (See Def. R. 56.1 Stmt., Ex. 17 (Herzig Decl.) (Dkt. No. 108-18) ¶ 30) ("Mr. Heffner relayed to me Mr. Goldman's representation to him that the endorsement was valid because apparently a premium credit had been already issued back to my insurance broker to account for the reduction in coverage.") But the November 2016 Endorsement states only that "[i]n consideration of [the coverage limit reduction], a Return Premium of US $1,954 is due." (Dkt. No. 117 at 6) The Endorsement does not state or imply that the validity of the Endorsement turns on or is affected by the premium credit.[18]

Finally, the true facts concerning the premium credit were readily discoverable by Herzig before he signed the Release. A call to Herzig's insurance broker – a step that Goldman himself suggested to Heffner (Def. R. 56.1 Stmt., Ex. N (Dkt. No. 108-15) at 2) – would have established the status of the premium credit.

---

[18] Herzig also contends that the misrepresentation about the premium credit led him to believe that the November 2016 Endorsement "applied retroactively" to his October 2016 claim. (Def. R. 56.1 Stmt., Ex. 17 (Herzig. Decl.) (Dkt. No. 108-18) ¶ 30) As explained above, based on the plain language of the November 2016 Endorsement, any such reliance was not reasonable.

48

The Court concludes that Herzig has not raised a material issue of fact as to whether he was defrauded in connection with Goldman's misrepresentation that a premium credit had been issued to Herzig's insurance broker.

> **d.      Plaintiff's Case Law Citations Do Not Demonstrate that He Was Fraudulently Induced to Sign the Release**

Herzig cites a number of decisions in which courts found material issues of fact regarding a party's claim that it was fraudulently induced to sign a release.  (See Def. Opp. (Dkt. No. 106) at 26-27)  None of these cases is persuasive here, because the relevant facts are not comparable.

In National Conversion Corp. v. Cedar Building Corp., 23 N.Y.2d 621 (1969), for example, the plaintiff tenant had sued the defendant landlords for fraud in connection with the negotiation of a lease.  During the lease negotiations, the plaintiff tenant – which operated a fertilizer business – had "sought an adjournment of the negotiations in order for its lawyer to check whether the premises were [subject to any zoning restrictions, but the] landlords' lawyer, who was also one of the principals, said that it would not be necessary, that the[] landlords 'own[ed] the property, and [they knew] the area,' that it [was] an unrestricted zone, and [that the] 'landlords guarantee[d] it' . . . . The discussion was resolved only by including the representation [of unrestricted zoning] in the lease." Id. at 626.  It later emerged that the premises were in fact subject to a zoning restriction.  Id. at 625.

When litigation ensued, the "[l]andlords argue[d] that tenant, represented by a lawyer, was just as much on notice, as they, the landlords, were, that the premises were located in a restricted zone.  Ergo, they invoke[d] the familiar rule that one may not charge another with fraud if one knew, or should have known, the actual situation." Id. at 626.  The court denied the landlords' motion for summary judgment on the tenant's fraud claim, however, holding that the

landlords had "intentionally or recklessly made false representations either as to their knowledge of the facts or the facts themselves," and that "tenant's lawyer was persuaded not to verify the status of the premises on the landlords' representation." Id. at 626-27.

In sum, in National Conversion Corp., the tenant sought a pause in the lease negotiations to verify a critical fact; the landlords persuaded the tenant that a delay was not necessary because they were in a position to "guarantee" that no zoning restriction was applicable; and the landlords' "no zoning restriction" representation was included in the contract.

Here, by contrast, Goldman sent Heffner the November 2016 Endorsement and described it by email on December 29, 2016. (See Def. R. 56.1 Stmt., Ex. G (Dkt. No. 108-8) at 2) According to the stricken Heffner declaration, Heffner "called Mr. Goldman to challenge the contentions in his email." (Heffner Decl., Def. R. 56.1 Stmt., Ex. 18 (Dkt. No. 108-19) ¶ 21) But there is no evidence that Heffner sought additional time to investigate the validity of the November 2016 Endorsement, or that he had any interest in verifying the validity of the Endorsement. Heffner likewise did not seek – much less obtain – a "guarantee" from Goldman as to the Endorsement's validity. Instead, about two hours after Goldman's email attaching the November 2016 Endorsement, Heffner emailed Goldman to say, "Please be advised that my client is signing the release." (Def. R. 56.1 Stmt., Ex. N (Dkt. No. 108-15) at 2) Finally, unlike the tenant in National Conversion Corp., Herzig did not insist that Goldman's alleged representation concerning the validity of the Endorsement be included in the Release. Indeed, the Release does not mention the Endorsement.

For all these reasons, the conduct of the parties here is not comparable to that of the landlords and tenant in National Conversion Corp.

In <u>Citibank, N.A. v. Real Coffee Trading Co., N.V.</u>, 566 F. Supp. 1158 (S.D.N.Y. 1983), plaintiff bank and defendant coffee exporter had settled a claim in which the bank had alleged that the coffee exporter owed it more than $18 million.  <u>See id.</u> at 1160.  The bank later sued the coffee exporter for breach of contract concerning promissory notes executed as part of the settlement.  <u>See id.</u>  The coffee exporter counterclaimed for fraud, alleging that the $18 million obligation was "the result of frauds which [the bank] knew or should have known about" and had concealed from defendant during the settlement negotiations.  The court denied the bank's motion for summary judgment on defendant's fraud claim, holding that defendant had raised material issues of fact regarding the validity of the settlement.  <u>See id.</u> at 1162-63.

<u>Real Coffee Trading</u> is not on point here, because the defendant in that case had offered evidence not only that the bank had obtained the settlement through misrepresentations, but also that the true facts concerning the alleged $18 million debt did not become available to the defendant until after the settlement agreement was executed.  Here, by contrast, the Policy and the November 2016 Endorsement – when considered together with well-established case law – should have put Herzig on notice of the falsity of Goldman's alleged representations regarding the validity and effect of the Endorsement.

<u>Powell v. Adler</u>, 128 A.D.3d 1039 (2d Dept. 2015) is a personal injury case in which the defendant car owner and the defendant driver moved for summary judgment on the grounds that the plaintiff accident victim had signed a release.  Plaintiff and her daughter submitted affidavits stating that defendants' insurance adjuster – who had obtained the release – had "visited the plaintiff only three days after the accident, that the plaintiff was still taking pain medication at that time, and that the insurance adjuster stated that the money was for the plaintiff's 'inconvenience' and not to compensate her for any injuries, pain or suffering."  <u>Id.</u> at

1041.  Based on this evidence, the court denied summary judgment, finding that there were "triable issues of fact as to whether, <u>inter alia</u>, there was fraud in the inducement of the release, and as to whether the release was fairly and knowingly made."  <u>Id.</u>  An insurance adjuster pressuring an accident victim on painkillers – and who was without counsel – to sign a release three days after an accident presents a factual scenario that has nothing in common with the facts here.[19]

  In sum, the cases cited by Herzig do not support his fraud claim.

*  *  *  *

  For all these reasons, this Court concludes that Herzig has not demonstrated a material issue of fact as to whether he was fraudulently induced to sign the Release.[20]

  **2.  <u>Herzig's Claim that He Signed the Release Under Duress</u>**

  Herzig contends that the Release is not enforceable because he signed it under duress.  (Def. Opp. (Dkt. No. 106) at 26)  In making this argument, however, Herzig does not acknowledge that (1) he did not plead the affirmative defense of duress in his Answer to the SAC; and (2) when Herzig moved to amend his Answer to add the affirmative defense of duress, this Court denied his motion, finding that amendment would be futile, because Herzig had not pled facts sufficient to make out the affirmative defense of duress.[21]

---

[19]  <u>Sharon v. 398 Bond St., LLC</u>, 169 A.D.3d 1079 (2d Dept. 2019) – also cited by Herzig (<u>see</u> Def. Opp. (Dkt. No. 106) at 27) – is of no use here because the court merely states without explanation that "plaintiff raised a triable issue fact as to whether there was fraud in the inducement of the release."  <u>Id.</u> at 1081.

[20]  The Court would reach the same conclusion even if the Heffner declaration were admissible.

[21]  Perhaps because of this Court's order denying leave to amend, Herzig does not use the word "duress," but instead refers to "legal and extrinsic pressure," "pressure points," and being "coerced."  (Def. Opp. (Dkt. No. 106) at 26)  Herzig cannot evade this Court's prior ruling by studiously avoiding the word "duress."

a.     **Applicable Law**

Fed. R. Civ. P. 8(c)(1) provides that "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including . . . duress. . . ."

"The general rule in federal courts is that a failure to plead an affirmative defense results in a waiver." Travellers Int'l, A.G. v. Trans World Airlines, Inc., 41 F.3d 1570, 1580 (2d Cir. 1994).  Rule 8(c) "is intended to notify a party of the existence of certain issues, and its mandatory language has impelled [the Second Circuit] to conclude that a party's failure to plead an affirmative defense bars its invocation at later stages of the litigation. . . .  If [a party] ha[s] already waived the right to litigate the issue, he obviously [cannot] win his case on that point." Doubleday & Co. v. Curtis, 763 F.2d 495, 503 (2d Cir. 1985) (citation omitted).

Accordingly, courts in this Circuit routinely hold that "[a]n unpleaded affirmative defense raised for the first time in a motion for summary judgment has . . . been waived under Rule 8(c)." Design Options, Inc. v. BellePointe, Inc., 940 F. Supp. 86, 92 (S.D.N.Y. 1996); see, e.g., id.; Windward Bora, LLC v. Sotomayor, No. 21-CV-7161 (CS), 2023 WL 2575582, at *4 (S.D.N.Y. Mar. 20, 2023) ("Defendants also raise in their opposition [to summary judgment] and cross-motion [for summary judgment] an affirmative defense that they did not include in their Answer:  Plaintiff's alleged failure to comply with [a notice provision].  But 'a party's failure to plead an affirmative defense bars its invocation at later stages of the litigation.'") (quoting Doubleday, 763 F.2d at 503); Chen v. New Trend Apparel, Inc., 8 F. Supp. 3d 406, 453 (S.D.N.Y. 2014) (on a motion for summary judgment, holding that defendants had waived affirmative defense that they "qualif[ied] as buyers in the ordinary course" by not including the defense in their answer); Clarendon Nat. Ins. Co. v. Hartford Ins. Co., No. 94 CIV 5529 (AGS), 1998 WL 230936, at *2 (S.D.N.Y. May 8, 1998) ("[Defendant] did not raise the affirmative defense of estoppel until it submitted its papers in response to [plaintiff's] motion [for summary

judgment].  The Court therefore finds that this defense has been waived."); Therion, Inc. v. Media by Design, Inc., No. CV 08-5256 TCP ETB, 2010 WL 5341925, at *9 (E.D.N.Y. Nov. 10, 2010) (denying motion for summary judgment with respect to immunity defense not raised in answer), report and recommendation adopted, No. 08-CV-5256 TCP ETB, 2010 WL 5341920 (E.D.N.Y. Dec. 16, 2010); In re WorldCom, Inc., 361 B.R. 697, 716 (Bankr. S.D.N.Y. 2007) ("[T]he Court finds that [claimant] has waived any affirmative defenses regarding enforceability on the basis of unconscionability or violation of public policy [at the summary judgment stage] due to its failure to raise the defense in its Answer or any other responsive pleading.").

Moreover, where a court has previously ruled that factual allegations are insufficient to support a claim or affirmative defense as a matter of law, under law of the case principles – and absent a successful motion to amend – that claim or defense cannot be resurrected at summary judgment based on new information obtained during discovery.  See de Abreu v. Bank of Am. Corp., 812 F. Supp. 2d 316, 324 n.4 (S.D.N.Y. 2011) ("Because this Court, at the motion-to-dismiss stage, already found these . . . allegations insufficient to support an allegation of actual knowledge, it follows that these allegations, even if sufficiently supported by the discovery materials, are insufficient to support Plaintiffs' allegation of actual knowledge at the summary-judgment stage.").

Here, Herzig's July 2, 2018 Answer to the SAC includes thirteen affirmative defenses, but Herzig does not plead the affirmative defense of duress.  (Answer to SAC (Dkt. No. 49) at 8-10)  And while Herzig moved on November 22, 2019 – after the close of discovery – to amend his Answer to include the affirmative defense of duress (Dkt. Nos. 80-81), this Court denied Herzig's motion on futility grounds in an August 25, 2020 order, finding that "Herzig ha[d] not alleged facts that demonstrate[d] a plausible economic duress defense."  (Aug. 25,

2020 Order (Dkt. No. 86) at 9)  Herzig did not move for reconsideration of that order, nor did he file any subsequent motion to amend.

As discussed above, where a party has not pled the affirmative defense of duress in his answer, that party has waived the right to argue duress at any point, including at summary judgment.  Here, Herzig did not plead the affirmative defense of duress in his Answer to the SAC, and while he later moved to amend to add that affirmative defense to his Answer, this Court denied that motion, finding that Herzig's factual allegations as to that proposed affirmative defense were insufficient as a matter of law.  That ruling is now law of the case, and Herzig cannot contravene it by arguing at summary judgment that there are material issues of fact as to whether he signed the Release under duress.  Permitting Herzig to ignore this Court's prior ruling would be particularly improper here, given that the alleged new evidence – set forth in the Heffner declaration – was not the product of discovery but instead was available to Herzig from the outset of this case.

While (1) "'a district court may entertain unpleaded affirmative defenses at the summary judgment stage in the absence of undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futility, or undue delay of the proceedings,'" Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co., 762 F.3d 165, 176 (2d Cir. 2014) (quoting Rose v. AmSouth Bank of Fla., 391 F.3d 63, 65 (2d Cir. 2004)); and (2) courts have found no waiver where the opposing party has given "implied consent to file an amended [a]nswer" that includes the affirmative defense, Mooney v. City of New York, 219 F.3d 123, 127 n.2 (2d Cir. 2000), neither exception to the general waiver rule applies here, because (1) Great Lakes opposed Herzig's prior attempt to add the affirmative defense of duress, and (2) this Court denied the motion to amend, finding that addition of the duress defense would be futile, because Herzig had

not pled facts sufficient to enable the proposed duress defense to survive a Rule 12(f) motion to strike.  In short, this is not a situation "'where the defense is raised at the first pragmatically possible time and applying it at that time would not unfairly prejudice the opposing party.'"  Animazing Ent., Inc. v. Louis Lofredo Assocs., 88 F. Supp. 2d 265, 268 (S.D.N.Y. 2000) (quoting American Federal Grp. v. Rothenberg, 136 F.3d 897, 910 (2d Cir. 1998)).

     Finally, even if this Court were to consider Herzig's duress argument, it would find that he has not proffered admissible evidence sufficient to demonstrate a material issue of fact.

     As discussed above, the only evidence that Great Lakes presented Herzig with an "exploding offer" – in which it set a 24-hour deadline for Herzig to accept its "final settlement offer" subject to an immediate cancellation of insurance if he did not – is the inadmissible and stricken Heffner declaration, and Herzig's declaration repeating Heffner's hearsay statements.  As the Court explained in its August 25, 2020 order denying Herzig's motion to amend to add an affirmative defense of duress, the admissible evidence on this point – the emails between Goldman and Heffner – do not demonstrate that Goldman made an unlawful threat, as is required for a duress defense:

> Herzig . . . contends that Great Lakes insisted that Herzig respond to its settlement offer "immediately," failing which the Policy would be cancelled.  (Def. Reply Br. (Dkt. No. 83) at 5-6 (the "time to respond was set: 'immediately'"))  There is no such evidence.  Although Great Lakes' attorney stated in a December 29, 2016 email that he "await[ed] [Herzig's] anticipated acceptance of [the proposed settlement's] terms ASAP," Great Lakes did not set a time limit for Herzig to respond to its settlement offer.  (Dec. 29, 2016 Great Lakes email (Dkt. No. 64-15) at 2)  Indeed, in the same December 29, 2016 communication, Great Lakes references the fact that the Court had scheduled a pretrial conference for April 6, 2017 – more than three months distant.  In short, Great Lakes did not demand that Herzig accept its settlement offer "immediately," nor did it set a deadline for Herzig to accept its settlement offer.  Given that Great Lakes set no explicit deadline for Herzig's acceptance of its settlement proposal, Herzig cannot

plausibly claim that the settlement offer left him with no alternative but to accept
it immediately.

(Aug. 25, 2020 Order (Dkt. No. 86) at 7)

       Moreover, Herzig's duress argument is premised on the claim that Great Lakes'
alleged threat to immediately cancel his insurance – if he did not quickly accept the insurer's
"final settlement offer" – forced Herzig to accept an unreasonably low settlement figure of
$175,000.  (See Def. Opp. (Dkt. No. 106) at 26 (describing $175,000 as a "lowball offer"))  As
noted in this Court's August 25, 2020 order (see Dkt. No. 86 at 8-9), however, by mid-day on
December 28, 2016 – before Goldman's alleged December 29, 2016 threat to cancel the
insurance coverage immediately if Herzig did not accept Great Lakes' offer – Herzig had already
agreed to accept the $175,000 offer.  (See Def. R. 56.1 Stmt., Ex. G (Dkt. No. 108-8) at 4 (Dec.
28, 2016, 12:15 p.m. email from Heffner to Goldman, stating:  "Please allow this to confirm our
telephone conversation, wherein on behalf of my client, Peter Herzig, your client's offer to settle
the subject claim in the amount of $175,000 is accepted."))  Because Herzig accepted the
$175,000 offer before Goldman made the alleged unlawful threat, Herzig's duress claim has no
factual basis.

       Finally – as this Court's August 25, 2020 order also makes clear – a party
asserting the affirmative defense of duress must "show that he had 'no legal remedies available'
to him other than accepting the settlement offer."  (Dkt. No. 86 at 8 (quoting Nelson, 713 F.
Supp. at 110))  Herzig has once again offered no explanation as to why he could not have moved
this Court to "issue a preliminary injunction barring Plaintiff from terminating coverage."  (Id.)[22]

---

[22]  Herzig also argues both that "if [he] did not accept [Great Lakes' terms] and allowed [his]
insurance on Crescendo to terminate, [his] only recourse would have been to strip the vessel and
sell it for parts at a salvage yard," because "the marina would demand that Crescendo be
removed from the facility immediately" if insurance lapsed; and that – had Goldman not

For all these reasons, Herzig has not proffered evidence sufficient to demonstrate a material issue of fact as to whether his execution of the Release was the product of duress.[23]

### 3.    Whether Great Lakes Breached the Release By Not Filing a Stipulation of Dismissal

Herzig contends that the Release calls for Great Lakes to file a stipulation of dismissal by January 28, 2017.  (Def. R. 56.1 Stmt. (Dkt. No. 108) ¶ 111)  It is undisputed that Great Lakes did not do so.  (Id. ¶ 112)  Herzig therefore argues that his performance under the Release is excused because Great Lakes did not file a stipulation of dismissal, and thereby breached the Release.  (See Def. Opp. (Dkt. No. 106) at 27-28)  Herzig's argument fails, because the Release does not require Great Lakes to file a stipulation of dismissal.

The Release provides

> that a Stipulation for Dismissal with Prejudice pertaining to the above referenced Complaint filed by the Releasors and/or the latter's counsel will be provided by Releasors and/or their counsel within 30 days of the date of this agreement.

(Pltf. R. 56.1 Stmt., Ex. L (Dkt. No. 109-12) at 3)  "Releasor" is defined as "Peter Herzig."  (Id. at 2)  Accordingly, under the Release, it was Herzig, and not Great Lakes, who had the obligation to file the stipulation.  See Alvarez, 82 A.D.3d at 688 (holding that a release that is "complete, clear, and unambiguous on its face must be enforced according to the plain meaning of its terms"; given the "clear, unambiguous language of the [release in that case], parol evidence

---

misrepresented the coverage after the November 2016 Endorsement – Herzig would have considered whether "self-insurance [was] worth pursuing."  (Def. R. 56.1 Stmt., Ex. 17 (Herzig Decl.) (Dkt. No. 108-18) ¶¶ 27-28, 34)  But either the loss of insurance would have resulted in the immediate removal of the Crescendo from dockage and its sale for scrap, or Herzig would have considered "self-insurance."  Both propositions cannot be true.

[23] The Court would reach the same conclusion even if the Heffner declaration were admissible.

[could not] be considered to vary or alter its terms"); accord Sharon, 169 A.D.3d at 1080;

Burgos, 155 A.D.3d at 600.[24]

Because the Release imposed no duty on Great Lakes to file the stipulation, it did

not breach the Release by failing to do so.[25]

*     *     *     *

The Court concludes that the Release is valid and enforceable.  Accordingly,

Great Lakes is entitled to summary judgment on the SAC's Second Cause of Action, in which it

seeks a declaration that the Release is valid and binding.

C.   **Great Lakes' Material Misrepresentation Claims**

In the SAC's Third Cause of Action, Great Lakes seeks a declaration that the

Policy was void ab initio because of material misrepresentations in Herzig's insurance

application.  Great Lakes asks this Court to rule that it has no further obligation to pay for repairs

to the Crescendo.  (SAC (Dkt. No. 48) ¶¶ 35-45)  This Court's determination that the Release is

valid and binding renders the Third Cause of Action moot, however, because the effect of that

determination is that Great Lakes has no further obligation under the Policy to pay for repairs to

the Crescendo.  Because (1) Great Lakes seeks the same relief in its Second and Third Causes of

Action; (2) this Court is granting Great Lakes summary judgment on the Second Cause of

Action; and (3) the Policy is no longer in place, meaning Herzig can make no further claims, the

Third Cause of Action is moot.  See Allco Fin. Ltd. v. Klee, No. 3:15-CV-608 (CSH), 2016 WL

---

[24]  In any event, any failure to file the stipulation of dismissal was not a material breach.  See
Xerox Corp. v. W. Coast Litho, Inc., 251 F. Supp. 3d 534, 536 n.2 (W.D.N.Y. 2017) (holding
that "Plaintiff not comply[ing] with its obligation under the [s]ettlement [a]greement to file a
notice of dismissal in this lawsuit . . . .  [did] not amount to a material breach because the
magnitude of the default [was] not significant, and it [did] not go to the heart of the agreement").

[25]  The Court would reach the same conclusion even if the Heffner declaration were admissible.

4414774, at *10–11 (D. Conn. Aug. 18, 2016) (termination of contract that was subject of dispute mooted party's claim that contract was void <u>ab initio</u>), <u>aff'd</u>, 861 F.3d 82 (2d Cir. 2017). Accordingly, Great Lakes' motion for summary judgment as to its Third Cause of Action will be denied as moot.

In the SAC's Fourth Cause of Action, Great Lakes seeks a declaration that – because of material misrepresentations in Herzig's insurance application – Great Lakes is entitled to restitution of the $175,000 it paid to Herzig as consideration for the Release. (SAC (Dkt. No. 48) ¶¶ 46-62)

Having granted Great Lakes summary judgment on its claim that the Release is a valid and binding contract, this Court cannot now dismantle that same contract and direct Herzig to return the consideration that is a key element in the formation of any binding contract. Great Lakes has not argued, and has not demonstrated, that it is entitled both to enforcement of the Release as a binding contract and to a ruling directing Herzig to return the $175,000 in consideration he received in exchange for entering into the Release. Accordingly, Great Lakes' motion for summary judgment on its Fourth Cause of Action will be denied.[26]

---

[26] Plaintiff's material misrepresentation claims are premised on a May 24, 2016 email in which Christopher Reid of Quaker told Neil Burton of Concept that (1) "[t]he $270k is the rough final number of total costs the client will have paid to repair the boat;" and (2) "last spring [2015] the client paid $250k for 1,000-hour engine service." (Pltf. R. 56.1 Stmt. (Dkt. No. 109) ¶ 30; <u>see</u> Pltf. Br. (Dkt. No. 110) at 8) Had it been necessary for this Court to determine whether there are material issues of fact concerning the alleged misrepresentations, this Court would have found that there are material issues of fact as to agency, falsity, materiality, and reliance.

As to agency, there are material issues of fact as to whether Quaker had actual authority to bind Herzig. Daniel Walsh – a director at Quaker – testified that Quaker does not have the authority to act on behalf of retail brokers such as Crystal. (Def. R. 56.1 Stmt. (Dkt. No. 108) ¶ 88) As to apparent authority, Great Lakes is required to cite actions of Herzig that create "the appearance of authority in the agent." <u>Garanti</u>, 697 F.3d at 73 (quotation omitted). Great Lakes has proffered no such evidence.

## CONCLUSION

For the reasons stated above, Great Lakes' motion for summary judgment (Dkt. No. 91) is (1) granted as to the SAC's Second Cause of Action; (2) denied as moot with respect to the SAC's Third Cause of Action; and (3) denied as to the SAC's Fourth Cause of Action. Great Lakes' motion to strike (Dkt. No. 118) is granted. The Clerk of Court is directed to terminate the motions (Dkt. Nos. 91, 118).

Great Lakes did not seek summary judgment on the SAC's First Cause of Action, which seeks a declaratory judgment that Great Lakes' obligation to pay the reasonable cost of repairs does not exceed $175,000. (See SAC (Dkt. No. 48) ¶¶ 23-28, p. 13 ¶¶ E-F) The First

---

As to the falsity of the $270,000 in repair costs, there is a material issue of fact as to whether the "$270k . . . rough final number" statement was false at the time it was made. The phrase "rough final number" conveys that the total cost had not yet been determined (see Pltf. R. 56.1 Stmt. (Dkt. No. 109) ¶ 28 (stating that the final invoice for repairs was not issued until July 2016), and the $270,000 figure was consistent with an estimate Herzig had obtained from a qualified surveyor. (Def. R. 56.1 Stmt. (Dkt. No. 108) ¶ 84)

As to materiality, the statement that Herzig had paid "$250k for [a] 1,000-hour engine service" in the spring of 2015 was a misrepresentation, because Herzig admitted at deposition that he did not pay $250,000 for a 1,000-hour engine service in 2015. (Pltf. R. 56.1 Stmt. (Dkt. No. 109) ¶ 31)

However, there is a material issue of fact as to whether that misrepresentation was material to Concept's decision to issue the Policy. In 2015, Herzig spent more than $250,000 in "repairs, service and upgrades to Crescendo, including but not limited to the vessel's engines." (Def. R. 56.1 Stmt. (Dkt. No. 109) ¶ 36) How the work that was performed in 2015 differs from a hypothetical engine service costing $250,000 – and whether that difference would have been material to Concept's underwriting decision – are fact-intensive questions that would require the Court to weigh conflicting evidence and testimony.

As to Great Lakes' reliance on the May 24, 2016 email, Concept did not issue the Policy until it obtained and reviewed the Scanlan Survey. Scanlan concluded that the Crescendo had a value of $625,000, and Concept's underwriting manager stated in emails that Concept "would not routinely question the valuation provided by a suitably experienced surveyor [such as Scanlan]." (Def. R. 56.1 Stmt. (Dkt. No. 108) ¶¶ 35, 93, 97-98) Given Concept's reliance on the Scanlan Survey, there is a material issue of fact as to whether Concept relied on the May 24, 2016 email in issuing the Policy.

Cause of Action appears to be moot, for the reasons explained above.  **By May 26, 2023,** Great Lakes will show cause why the SAC's First, Third and Fourth Causes of Action should not be dismissed, given this Court's ruling as to the SAC's Second Cause of Action.

Great Lakes likewise did not move for summary judgment on Herzig's counterclaims.  In his First and Second Counterclaims, Herzig asserts claims for fraudulent inducement and rescission based on alleged material misrepresentations by Great Lakes. (Answer to SAC (Dkt. No. 49) at 15-19)  There are two categories of alleged misrepresentations.

The first category of alleged misrepresentations relates to statements made by Goldman on December 29, 2016, regarding the November 2016 Endorsement and the credit of premium return.  (See id. at 14-19)  In granting Great Lakes summary judgment on its Second Cause of Action, this Court held that Goldman's alleged misrepresentations were not material representations upon which Herzig reasonably relied.

The second category of alleged misrepresentation relates to Great Lakes' representation that "$175,000.00 was the maximum required to effect the covered repairs to the vessel."  (Id. at 13, 16, 18)  Based on the evidence in the record, it appears that Herzig – in signing the Release – did not rely on representations from Great Lakes or its agent about the adequacy of the survey or the cost of repairs.  The relevant evidence is as follows:

Herzig's surveyor, Shorter, attended the November 3, 2016 inspection of the Crescendo, and in an email to Herzig the next day, Shorter stated that, "in order to ascertain the full extent of the structural hull damage and the cost of repairs, [Shorter] had pointed out to all in attendance [at the inspection] that the correct way to survey this yacht [was] out of the water, using instruments and other proven skill methods."  (Pltf. R. 56.1 Stmt. (Dkt. No. 109) ¶ 44 (emphasis omitted))

62

Herzig then obtained two repair estimates from boat yards.  One estimate came in at $465,536, or an "all-in price" of $490,000.  The other estimate was for an "all-in price" of "approximately $155,000," not including "approximately $10,000 . . . already incurred."  (Pltf. R. 56.1 Stmt. (Dkt. No. 109) ¶ 52; Def. R. 56.1 Stmt., Ex. F (Dkt. No. 108-7) at 2)

On December 19, 2016, Herzig emailed Wager – the claim investigator Concept had retained – and discussed these two estimates, characterizing the $465,536/$490,000 quote as "high" and the $155,000 quote as "a minimum projected cost."  Herzig also stated that an estimate Wager had provided was "useless" and "serve[d] the purpose of the carrier only." Herzig proposed that Concept make a lump-sum payment of $300,000, a figure arrived at by calculating the midpoint of the two quotes Herzig had obtained and discounting it to account for the deductible under the Policy.  (Def. R. 56.1 Stmt., Ex. F (Dkt. No. 108-7) at 2-3)

On December 27, 2016 – having been informed of the instant lawsuit – Heffner wrote to Concept, reiterating Defendant's $300,000 lump sum settlement proposal and stating:

> You are basing your position on a woefully inadequate survey.  It is without dispute that you are evaluating the damages sustained by the subject vessel based upon a surveyor who did, at best, a cursory inspection while the vessel remained in the water.  We are at a complete loss as to how your surveyor can issue opinions that will dictate substantial repairs to a substantial vessel, without the vessel being placed in dry dock and subject to a thorough survey as dictated by standard and accepted practices and procedures followed by licensed and experienced surveyors in the subject community.  We stand by the estimates and opinions we have obtained from professionals with decades of experience evaluating issues comparable to those presented herein.

(Def. R. 56.1 Stmt. (Dkt. No. 108) ¶ 105; Dec. 27, 2016, Heffner Ltr. (Dkt. No. 115) at 3)

In sum, the evidence in the record indicates that – before Herzig agreed to enter into the Release on December 29, 2016 – he had (1) been informed of the purported inadequacies in the November 3, 2016 inspection of the Crescendo; (2) formed the view that those purported inadequacies made the resulting survey unreliable; (3) rejected Concept's quote as "useless"; (4)

obtained his own estimates of the cost of repairing the Crescendo; and (5) considered those estimates in arriving at what he believed to be a reasonable settlement.  Given this evidence, it appears clear that Herzig did not rely on representations by Great Lakes or its agent about the inspection, the survey, or the estimated cost of repairs.

Herzig's Third Counterclaim is for breach of contract regarding the November 2016 Endorsement.  Herzig alleges that "[u]nder the terms of the Policy, Great Lakes is not permitted to modify the value of the [P]olicy or any other provisions without the consent of Herzig," and therefore, "[b]y unilaterally reducing the value of the Policy [by issuing the November 2016 Endorsement], Great Lakes breached the terms of [the] [P]olicy."  (Answer to SAC (Dkt. No. 49) at 19-20)  Given that (1) no Policy provision authorizes unilateral modifications by Great Lakes; and (2) New York case law indicates that modifications to insurance policies require the insured's consent, see Danzig, 78 A.D.2d at 305-06, 309 (holding that "the modification [to a group health insurance policy] changing the lifetime maximum for expenses for private duty nursing care from 'unlimited' to $5000 [was] ineffective" because the insurer had not "obtain[ed] the consent of [the insureds] to such modification"), the November 2016 Endorsement may not have been valid.  But Herzig has not identified any provision of the Policy that Great Lakes breached by issuing the Endorsement.  Moreover, this Court has ruled that Herzig did not reasonably rely on the issuance of the November 2016 Endorsement in agreeing to the Release, and it is unclear what other damages he could have suffered in connection with the Endorsement.

In his Fourth Counterclaim, Herzig alleges breach of contract in connection with Great Lakes not paying the reasonable cost of repairs.  Herzig contends that "the sum of $175,000.00 was grossly inadequate to address the damages sustained to return the Vessel to its

pre-incident condition." (Answer to SAC (Dkt. No. 49) at 20-21)  But this Court has ruled that the Release Herzig executed is a valid and binding contract.  Having released Great Lakes from any further claim regarding the October 2016 damage to the Crescendo in exchange for a payment of $175,000 (see Pltf. R. 56.1 Stmt. (Dkt. No. 109) ¶ 57; Ex. L (Dkt. No. 109-12) at 2 ("[Herzig] releases, acquits, and forever discharges [Great Lakes] and Concept Special Risks Ltd. . . . of and from any and all [claims] which [Herzig or his] heirs, executors, administrators and assigns ever had, now have, or hereafter can, shall, or may have for . . . any and all known and unknown damage and/or property damage resulting . . . from the incident and the resulting claim for insurance coverage involving . . . Crescendo insured under [the Policy] which is alleged to have occurred on or about October 7, 2016.")), Herzig will not be heard to complain that the $175,000 was inadequate to perform the necessary repairs.

By May 26, 2023, Herzig will submit a letter (1) stating whether he intends to proceed to trial on his First, Second, and Third Counterclaims; and (2) showing cause why his Fourth Counterclaim should not be dismissed.

Dated: New York, New York
       May 18, 2023

SO ORDERED.

Paul G. Gardephe
United States District Judge