UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GREAT LAKES REINSURANCE
(UK) SE,

Plaintiff,

- against -

PETER HERZIG,

Defendant.

**MEMORANDUM
OPINION & ORDER**

16 Civ. 9848 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

This action arises from Defendant-Counterclaimant Peter Herzig's insurance claim for damage to his yacht under an insurance policy issued by Plaintiff-Counterdefendant Great Lakes Reinsurance (the "Policy"). This Court conducted a bench trial concerning Herzig's First, Second, and Third Counterclaims – the sole remaining claims in this case – on July 10 and 11, 2023. (Trial Tr. (Dkt. Nos. 170, 172)) The counterclaims are for fraudulent inducement, rescission based on fraud, and breach of contract. (Answer (Dkt. No. 49) ¶¶ 37-67) For the reasons stated below, the Court concludes that Great Lakes Reinsurance ("Great Lakes") is not liable on Herzig's counterclaims. Judgment will therefore be granted to Great Lakes on Herzig's counterclaims.

## BACKGROUND

## I.     PRE-TRIAL PROCEEDINGS

Great Lakes filed this case on December 21, 2016, as a declaratory judgment action. (Cmplt. (Dkt. No. 1)) Great Lakes had insured Herzig's yacht – the "Crescendo" – and the parties dispute Great Lakes' liability for damage the yacht suffered on October 7, 2016. (Id. ¶¶ 6-15)

On December 29, 2016, Herzig and Great Lakes settled their dispute pursuant to a Policyholder's Release ("the Release") that Herzig executed. (Stipulated Facts ("Stip.") (Dkt. No. 143-2) ¶ 12) Pursuant to the Release, and in exchange for $175,000, Herzig released all claims against Great Lakes and its underwriter, Concept Special Risks Ltd., arising out of damage the Crescendo suffered on October 7, 2016, and the resulting claim made under Herzig's Great Lakes policy. (GLX 24 at 1-2)[1]

Despite the parties' settlement and the executed release, this litigation continued. On June 13, 2018, Great Lakes filed the Second Amended Complaint ("SAC"), which asserts four causes of action. The First Cause of Action seeks a declaration that Great Lakes owes no more than $175,000 under the Policy – that being the reasonable cost of repairing the October 2016 damage to the Crescendo. The Second Cause of Action seeks a declaration that the Release is valid and binding. The Third and Fourth Causes of Action seek declarations that Herzig's misrepresentations of material fact in procuring the Policy rendered the Policy void ab initio and entitle Great Lakes to restitution of its $175,000 payment in connection with the Release. (Dkt. No. 48 ¶¶ 23-62)

On July 2, 2018, Herzig filed his Answer to the SAC. (Dkt. No. 49) Herzig's Answer includes counterclaims for fraud, rescission, and breach of contract. (Id. at pp. 15-21, ¶¶ 37-77)

---

[1] "GLX" refers to Great Lakes' trial exhibits. "HX" refers to Herzig's trial exhibits. The trial exhibits are docketed as attachments to the parties' July 14, 2023 joint letter (Dkt. No. 167).

The page numbers of documents referenced in this opinion correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system. Deposition and trial transcript page numbers refer to the pagination assigned by the court reporter.

On January 29, 2021, Great Lakes moved for summary judgment on the SAC's Second, Third, and Fourth Causes of Action.  Great Lakes did not move for summary judgment on Herzig's counterclaims.  (Dkt. No. 91)

On May 18, 2023, this Court granted Great Lakes summary judgment on its Second Cause of Action, and issued a declaration that the Release is valid and binding.  In so holding, this Court concluded that (1) "Great Lakes ha[d] established a prima facie case that the Release is an enforceable contract"; and (2) Herzig had not offered evidence that created a material issue of fact as to fraudulent inducement, duress, or prior material breach – the affirmative defenses he had raised in opposing Great Lakes' summary judgment motion.  See Great Lakes Reinsurance (UK) SE v. Herzig, 16 Civ. 9848, 2023 WL 3560578, at *20, *27, *30 (S.D.N.Y. May 18, 2023) (emphasis omitted).

In the summary judgment decision, the Court directed "Great Lakes [to] show cause why the SAC's First, Third and Fourth Causes of Action [– for declarations as to the reasonable cost of repair, voidness, and restitution –] should not be dismissed [as moot and/or contrary to the Release], given this Court's ruling as to the SAC's Second Cause of Action." Id. at *32.  The Court also directed Herzig to show cause why his fourth counterclaim – for breach of contract in connection with Great Lakes' alleged failure to pay the reasonable costs of repairs – should not be dismissed, given the Court's finding that the Release is valid and binding.  Id. at *33-34.

In a June 1, 2023 letter, Great Lakes stated that "there would be no objection to entry of an Order of Dismissal Without Prejudice as to each of the [First, Third, and Fourth] Causes of Action."  (Dkt. No. 129)  That same day, Herzig filed his response to this Court's show-cause order, and moved for reconsideration.  (Dkt. Nos. 130-32)

On June 9, 2023, this Court issued an order stating that "the SAC's First, Third, and Fourth Causes of Action are dismissed on consent." (Dkt. No. 134)

On June 15, 2023, Great Lakes filed a new action that re-pleaded the SAC's Third and Fourth Causes of Action. (Cmplt., 23 Civ. 5050 (PGG) (Dkt. No. 2))

On June 16, 2023, Great Lakes cross-moved for reconsideration, arguing that this Court erred in not granting Great Lakes summary judgment on Herzig's counterclaims. (Dkt. No. 137)

In a June 29, 2023 opinion, this Court denied the parties' cross-motions for reconsideration. (Reconsid. Op. (Dkt. No. 154))

In denying Great Lakes' motion for reconsideration as to whether it was entitled to summary judgment on Herzig's counterclaims, this Court noted that Great Lakes had not moved for summary judgment on Herzig's counterclaims, and was therefore not entitled to summary judgment on those counterclaims. (Id. at 27) And to the extent that Great Lakes sought summary judgment on Herzig's counterclaims in its reconsideration motion, the Court ruled that "[t]he time for filing a summary judgment motion concerning those counterclaims has long since passed." (Id. (citing Sept. 17, 2020 Scheduling Order (Dkt. No. 90)) The Court observed that "[w]hile the logic animating [the summary judgment opinion] may ultimately result in a ruling granting Great Lakes judgment on Herzig's counterclaims, those counterclaims must now proceed to trial." (Id.)

This Court likewise denied Herzig's motion for reconsideration, and further ruled that he had not shown cause as to why his Fourth Counterclaim should not be dismissed, in light of this Court's finding that the Release is valid and binding. Accordingly, the Court dismissed Herzig's fourth counterclaim. (Id. at 24-26)

In a June 29, 2023 order issued in Great Lakes' newly-filed action, this Court directed Great Lakes to show cause why its new complaint should not be dismissed with prejudice on res judicata and statute of limitations grounds. (23 Civ. 5050, Dkt. No. 8)

In a July 5, 2023 letter, Great Lakes stated that it "does not object to the Court's dismissal of the [second-filed] Complaint with prejudice." (23 Civ. 5050, Dkt. No. 9 at 1) Accordingly, on July 7, 2023, this Court dismissed the second-filed case with prejudice. (23 Civ. 5050, Dkt. No. 10)

## II.    HERZIG'S FIRST, SECOND, AND THIRD COUNTERCLAIMS

As a result of the Court's prior rulings, the only claims remaining for trial were Herzig's First, Second, and Third Counterclaims.

In his First and Second Counterclaims, Herzig asserts fraudulent inducement and rescission claims based on Great Lakes' alleged material misrepresentations in connection with Herzig's execution of the Release. (Answer to SAC (Dkt. No. 49) at pp. 15-19)

The claimed misrepresentations are premised on statements that Great Lakes' lawyer, Steven Goldman, allegedly made to Herzig's then-lawyer, the late Adam Heffner, on December 29, 2016, regarding (1) a November 2016 Endorsement to the Policy that reduced the coverage limit from $600,000 to $300,000 (the "November 2016 Endorsement"); and (2) a resulting credit on the premium that was returned to Herzig's insurance broker. Herzig contends that Great Lakes reduced the coverage limit unilaterally, and was not authorized to do so under the Policy. (See id. at 14-19) In his proposed findings of fact and conclusions of law, Herzig asks the Court to find that

> Great Lakes fraudulently induced Herzig to enter into the Release through late-December 201[6] misstatements by its agents that (i) the Purported Endorsement was valid and binding; (ii) the Purported Endorsement went into effect on November 18, 2016 and applied to Herzig's then-pending claim; and (iii) Great Lakes had returned $1,954 in premium in connection with the Purported

Endorsement. Each of those statements were made by Goldman to Heffner, Herzig's counsel, in connection with Great Lakes' efforts to induce Herzig to accept a $175,000 settlement before December 30. Each of those statements was knowingly false, or made with a reckless disregard for the truth, and Herzig reasonably relied on them to his detriment in agreeing to the Release.

(Herzig Proposed Findings of Fact and Conclusions of Law (Dkt. No. 151) ¶ 162)[2]

Herzig's Third Counterclaim is for breach of contract arising out of the November 2016 Endorsement. Herzig contends that "[u]nder the terms of the Policy, Great Lakes is not permitted to modify the value of the [P]olicy or any other provisions without the consent of Herzig." (Answer to SAC (Dkt. No. 49) at pp. 19-20) Accordingly, "[b]y unilaterally reducing the value of the Policy [in the November 2016 Endorsement,] Great Lakes breached the terms of [the] [P]olicy." (Id.) In his proposed findings of fact and conclusions of law, Herzig asks the Court to rule that "Great Lakes' unilateral modification of the 'Agreed Value' was a breach of the Policy because it modified the contract price without justification, improperly exposing Herzig to potential losses over $300,000." (Herzig Proposed Findings of Fact and Conclusions of Law (Dkt. No. 151) ¶ 189)

## FINDINGS OF FACT

## PARTIES

1.      Herzig resides in New York City. (Herzig Trial Decl. (Dkt. No. 150) ¶ 4) At all relevant times, "Herzig was the owner of a 1997 62 ft Sunseeker vessel under the name of 'Crescendo.'" (Stip. (Dkt. No. 143-2) ¶ 2)

---

[2] Herzig's Answer to the SAC also alleges that Great Lakes misrepresented that "$175,000.00 was the maximum required to effect the covered repairs to the vessel." (Answer to SAC (Dkt. No. 49) at pp. 13, 16, 18) Herzig did not pursue this allegation in his pretrial briefing, at trial, or in post-trial briefing, however. Accordingly, any such claimed misrepresentation has been abandoned.

2.    "Great Lakes is a foreign entity conducting business in the United States of America and the State of New York." (Id. ¶ 1)  "Great Lakes is an eligible surplus lines insurer" and "a subsidiary of Munich Reinsurance Company."  (HX DH at 7, 24)

3.    Great Lakes' "underwriting managing general agency" is Concept Special Risks Ltd. ("Concept").  (Id. at 7)  "Concept's role was to receive and to then evaluate applications for . . . marine insurance coverage," and then "either issue a quote to the surplus lines broker" seeking coverage or "refuse to issue a quote and . . . thereby reject [the] application."  (GLX 45 ¶ 6)

## ISSUANCE OF POLICY AND POLICY TERMS

4.    "Crystal & Company served as Herzig's insurance broker and agent."  (Id. ¶ 10) Herzig's primary contact at Crystal & Company ("Crystal") was account executive John Poplawsky.  (GLX 47)

5.    In May 2016, Poplawsky – acting on Herzig's behalf – contacted Christopher Reid, a representative of insurance broker Quaker Special Risk ("Quaker"), to procure an insurance policy for the Crescendo with a coverage limit of $600,000.  (Id. ¶ 3)  Reid submitted an application for insurance to Concept.  Concept issued a quotation, which Herzig ultimately accepted.  During the application process, Concept dealt exclusively with Quaker, and had no direct contact with Crystal or Herzig.  (GLX 45 ¶¶ 22-28)

6.    On or about July 8, 2016, "Great Lakes issued Policy No. CSRYP/156842 insuring the Crescendo with $600,000 Hull & Machinery coverage."  (Stip. (Dkt. No. 143-2) ¶ 3; (GLX 3 at 2))

7.    The declaration page of the Policy indicates that the Policy was issued by "Concept Special Risks."  The "[i]nsurance [p]rovider" is "Great Lakes Reinsurance (UK) SE." (GLX 3 at 1-2)

8.      "Assured's Agent" is "Quaker Special Risk New Jersey." (Id. at 1)

9.      The "Period of Cover" is May 26, 2016 to May 26, 2017.  The "hull sum insured" – which is listed in Section A of the declaration page – is $600,000.  The premium is $12,257. (Id.)

10.      For purposes of the Policy, "'Agreed Value' means the sum insured under Section A of the insuring agreement declaration page or any endorsement to the same." (Id. § 1(t))  The Agreed Value stated in the Policy is $600,000.  (Id. at 1)

11.      As explained by Concept Managing Director Beric Anthony Usher, the Policy is an "agreed value policy."  "An agreed value is whereby the insured and the underwriter, but primarily the underwriter, agree[] [that the insurer will] insure the vessel on an agreed value." Because the Policy is "an agreed-value[] policy, [the underwriter] need[s] to reach agreement with . . . the assured on [the value]."  (HX DH at 110-11)

12.      The Policy equates the "agreed value" and the "hull sum insured," which is the coverage limit.  (GLX 3 § 1(t))  The Crescendo was thus insured up to its full "agreed value."

13.      The Policy further provides that "[i]f a sum insured is shown for Section A of the insuring agreement declaration page, we provide coverage for accidental physical loss of, or accidental physical damage to the Scheduled Vessel which occurs during the period of this insuring agreement and within the limits set out in the insuring agreement declarations page, subject to the insuring agreement provisions, conditions, warranties, deductibles and exclusions." (Id. § 3)  "We have the right to either pay you the reasonable costs of repairs of your vessel or . . . declare your vessel a constructive total loss."  (Id. § 9(w))

14.      The Policy also states that "[t]his insuring agreement may be cancelled by either you or us at any time, subject to 10 days prior written notice."  (Id. § 9(e))

15.     The Policy further states that "[i]f you have used a broker to effect coverage, it is hereby agreed that your brokers or any substituted brokers (whether surplus line approved or otherwise), shall be deemed to be exclusively the agents of you and not of us in any and all matters relating to, connected with or affecting this insurance.  Any notice given or mailed by or on behalf of us to the said brokers in connection with or affecting this insurance, or its cancellation, shall be deemed to have been delivered to you."  (Id. § 9(h))

16.     The Policy also states that, "[u]nless specifically agreed by us in writing and additional premium charged[,] the following losses and/or damages (whether incurred directly or indirectly) are not covered by this insuring agreement:  . . . [l]osses due to wear and tear, gradual deterioration, [or] lack of maintenance[;] . . . [y]our personal expenses or those of your family including but not limited to the, cost of your own labour, hotel or accommodation costs, car rental and communication costs[;] . . . [and] [l]osses caused by delay in repairs and/or loss of use and/or enjoyment of the Scheduled Vessel and/or its equipment."  (Id. §§ 3(b), (j), and (k))

17.     The Policy further states that "[i]t is hereby agreed that any dispute arising hereunder shall be adjudicated according to well established, entrenched principles and precedents of substantive United States Federal Admiralty law and practice[,] but where no such well established, entrenched precedent exists, this insuring agreement is subject to the substantive laws of the State of New York."  (Id. § 11)

18.     The "Concept Special Risks Claim Leaflet" attached to the Policy states:  "We are committed to treating customers fairly as a matter of good business and fair dealing.  To achieve this, we give the following undertakings: . . . Our policy documentation will be in accordance with market & regulatory standards."  (Id. at 18)

**THE OCTOBER 7, 2016 DAMAGE TO THE CRESCENDO**

19.    "On or about October 7, [2]016, while the above referenced policy was in full force and effect, the subject vessel sustained damage as a direct result of the effects of and from Hurricane Matthew, while the subject vessel was in port in or near Jacksonville, Florida. Herzig reported the subject loss promptly and properly." (Stip. (Dkt. No. 143-2) ¶¶ 4-5)

**HERZIG'S INSURANCE CLAIM AND PRE-LITIGATION NEGOTIATION**

20.    Herzig and Concept disagreed about the value of Herzig's claim. Herzig "attempted to negotiate an amicable resolution with Great Lakes' claim adjuster, Doug Wager." (HX DE ¶ 13)

21.    In connection with his insurance claim, Herzig retained marine surveyor Roy Shorter and attorney Adam Heffner. Shorter and Heffner had previously represented Herzig in an insurance dispute with AIG, which had formerly insured the Crescendo. That dispute ended with AIG paying Herzig $600,000, the "full insured value." (Trial Transcript ("Tr.") at 66-67) Shorter attended a November 3, 2016 inspection of the Crescendo performed by Concept-retained surveyor Michael Grant. Shorter reported to Herzig that the inspection had not been properly performed. (HX K; HX DE ¶ 12)

22.    In a November 11, 2016 email to Crystal insurance broker Poplawsky, Herzig states: "In the AIG debacle, I was too patient and nice at the beginning and they tried to take advantage of that and trample me. Lesson learned. I will be proactive and determined to defend my interests from the outset here." (GLX 49)

23.    Herzig and Concept each obtained repair estimates from boat yards. On November 22, 2016, Cable Marine provided Herzig with an estimate of $155,000. (GLX 10) And on December 12, 2016, All Points Boats provided Herzig with an estimate of $465,000.

(GLX 11)  On December 17, 2016, Yacht Management Group provided Concept with an estimate of $104,000.  (GLX 13)

24.    "In mid-December 2016, [Herzig] received a telephone call from [Great Lakes claims adjuster] Wager in which he proposed the idea of resolving [Herzig's claim] through a single, upfront payment [of $175,000] in exchange for a release."  (HX DE ¶ 15)

25.    In a December 19, 2016 email to Wager, Herzig countered with an offer to settle his claim for $300,000.  Herzig's $300,000 figure was premised on taking the midpoint between the Cable Marine and All Points Boats estimates and reducing the sum to account for the Policy's deductible.  Herzig asserted that the Yacht Management Group estimate of approximately $104,000 was "useless" because it "is an estimate requested by a carrier and serves the purpose of the carrier only.  The [Yacht Management Group] quote is rejected without reservation and please do not raise it again or this process will deteriorate rapidly."  Herzig's counteroffer required (1) payment by December 26, 2016; and (2) that the Policy remain in effect for its stated term.  (GLX 14)

26.    Wager replied by email that day, stating that he (1) believed that the inspection conducted by Concept's surveyor had been adequate; (2) disagreed with the inclusion of certain paintwork in the Cable Marine estimate; and (3) was requesting a "breakdown of the All Points [Boats] estimate."  Herzig responded as follows:

> [Y]our surveyor's estimate [is] based on an incomplete examination of the vessel. It was not a complete survey and is not a reliable barometer of the potential extent of the damage.  Roy Shorter maintains that it is possible that the vessel is beyond repair, especially given a $600,000 policy limit. . . . I strongly encourage you to recommend to the insurer that they accept my proposal as is.  I have spent enough time on this and we are going nowhere and the boat is not getting any closer to being repaired.  If this matter is not resolved to my satisfaction in the next 24 hours, I will refer the matter to my attorney and extract myself from the discussion.  That's not the route I prefer, but based on your most recent email I judge that it may be inevitable.  Let us hope not.  Best, Peter.

(GLX 15 at 1)

27.    On December 19 or 20, 2016, Great Lakes retained Steven Goldman as its counsel for this matter.  (Tr. at 109, 113; HX BF at 3)

**THE NOVEMBER 2016 ENDORSEMENT**

28.    On November 16, 2016, Great Lakes claims adjuster Wager sent a report regarding the damage to the Crescendo to Concept Director and Claims Manager Mark Thomas. In his report, Wager notes that "[t]he $600,000 amount of insurance [provided for in the Policy] is well in excess of comparable vessels on the current market which are nearer to $300,000." (HX Z at 4)

29.    In a November 17, 2016 email response, Thomas expressed concern about the current valuation of the Crescendo as compared to the $600,000 valuation set forth in a survey that Herzig had commissioned several months earlier as part of his application to secure the Policy.  (HX AA at 2-3)  Thomas also forwarded Wager's report to Concept Managing Director Usher and several other Concept employees, stating that he was "concerned as to the stated and agreed value of this vessel.  Look forward to your comments so that we can make a determination as to coverage."  (HX AY at 4)  Concept Underwriting Manager Liam Gilhooly told Thomas that Concept "would not routinely question the valuation provided by a suitably experienced surveyor," and that "[f]rom an underwriting perspective, we would not normally do more than we have done here to determine the value of the vessel."  (Id. at 3-4)

30.    In a November 18, 2016 email to Usher, however, Gilhooly states that the $600,000 valuation of the Crescendo is excessive:  "We have a claim on the above vessel, you may have seen the correspondence with Mark [Thomas] from yesterday.  I am inclined to agree with Doug [Wager] and I have taken a look on Yachtworld and it does appear that the vessel

values (on average) are around the $300,000 mark. Procedurally would we inform the broker of

our intention to endorse the policy to reduce the coverage or do we just do it and email at the

same time?" Usher replied: "I think we should just go ahead and do it." Concept employee

Kathy Smith then generated the requested endorsement reducing the coverage to $300,000. (HX

N)

      31.    Set forth below is a screenshot of the one-page November 2016 Endorsement:



(GLX 9)

      32.    Concept remitted $1,945.00 to Herzig's agent – Quaker Special Risk – later that

day. Smith also sent Christopher Reid and other Quaker Special Risk employees an email

informing them of the Endorsement: "Further to the recent loss on this vessel the adjuster felt the actual current value of this vessel is $300,000, therefore we have endorsed the policy effective 18th November 2016." (HX R at 2)

33.    That same day, a Quaker Special Risk employee sent the November 2016 Endorsement by email to Herzig's insurance broker Poplawsky at Crystal. (GLX 27 at 6) Poplawsky "did not believe [the endorsement] was effective," because it was not "approved and stamped by the Excess Line Association of New York," which he understood to be a legal requirement. He did not inform Herzig of the November 2016 Endorsement at that time. (GLX 47 ¶¶ 8-10)

34.    Quaker Special Risk employees repeatedly expressed concern to Concept about the November 2016 Endorsement and its reduction in the coverage amount. In a November 21, 2016 email, Quaker Director of Personal Lines Danny Walsh wrote that Quaker was "having trouble with this endorsement especially being done before the claim is settled. . . . I am just coming into this file so if you can advise what prompted the decrease in value despite the survey being submitted and accepted. The retail agent on this one is one of our largest and they as well as the insured are not happy at the moment." (HX DG at 18) In a November 22, 2016 response, Concept's Usher stated: "Since the policy is an agreed value policy we must both agree on the valuation and I would therefore propose a compromise and value the vessel at $450K . . . . Needless to say this does not in any way [a]ffect the claims process since the effective date of the endorsement is post incident. . . . Please confirm everyone's agreement and we will amend the endorsement accordingly." (HX AM) There is no evidence that Walsh replied to Usher's November 22, 2016 email.

35.    In a December 20, 2016 email to Concept's Alex Thomas, Quaker's Christopher

Reid again complained about the November 2016 Endorsement: "The agent is still questioning

this change given that the above survey was accepted by Concept 90 days before the claim and

the dramatic decrease being requested by the market. Is there anything you can do to help us

better justify this change? Do you have supporting documentation that we can forward, etc.?"

(HX O)

36.    Thomas replied as follows: "The reason we elected to reduce the vessel's value

effective 18th November 2016 was courtesy of comments made by the attending surveyor

reporting on the damages who felt that the vessel was substantially over valued and had therefore

researched similar vessel values in the marketplace. . . . If the assured does not wish to increase

the limit to $450k (effective 20th Dec. 2016) as per the compromise made by Tony Usher, all we

can do is offer to cancel the assured's policy. Ours is an agreed value policy and we cannot

agree to retain the value at $600k." (Id.)

37.    Reid responded: "Can you please provide the written documentation from your

surveyor so we can forward to our agent[?]" Thomas replied: "There is no written

documentation available for me to send to you at this time." Quaker's Walsh replied: "Ok – we

will need something written from your surveyor to substantiate the decrease. . . [T]hat is too

tough of a sell to go back to our agent and advise that this whole decrease is based on a

conversation with no documentation to back it up – please have your surveyor put together

something in writing to substantiate the decrease." (HX AV) There is no evidence that Concept

provided such documentation.

38.    Great Lakes' counsel Steven Goldman learned of the November 2016

Endorsement on December 20, 2016, shortly after he was retained. (Tr. at 109) In a December

20, 2016 10:59 a.m. email to Great Lakes claims adjuster Wager – with a copy to Goldman –

Concept Claims Manager Mark Thomas asks: "Who was the attending surveyor [who] valued

this vessel at US $300K?" In a 1:21 p.m. email, Wager responds that the surveyor was Michael

Grant. Wager also attaches "the listings available from [YachtWorld's website] Soldboats," and

remarks that "[w]e may[be] should have estimated the actual value of the Crescendo to be nearer

to $200,000 given her condition. . . . It seems the last sale post[ed] on Soldboats was in January

2016 [for] $312,000." (HX BF at 24)

     39.    Later that afternoon, Wager forwards a copy of the November 2016 Endorsement

to Goldman, and states:

> What I am uncertain of is – if this was effective from November 18, 2016[,]
> which is after the Oct. 7, 2016[,] loss would it change anything? Was the return
> of premium – which I understand was accepted by the assured calculated on the
> remaining policy period – Nov. 18 to May 26, 2017 or from inception?

(Id. at 25) There is no evidence that Goldman responded to Wager's question.

**POST-COMPLAINT NEGOTIATIONS**

     40.    Great Lakes filed the Complaint on December 21, 2016, seeking a declaratory

judgment that the reasonable cost of repairs to the Crescendo was no more than $175,000. (Dkt.

No. 1 at 6)

     41.    In a December 23, 2016 email to Herzig, Concept Claims Manager Mark Thomas

attaches a letter reiterating Concept's $175,000 offer, as well as a copy of the Complaint. In his

email, Thomas says that "[i]f we can conclude this matter I can arrange for the funds to be wire

transferred to your nominated account within 7 days, subject to the receipt of an executed release

from you. If on the other hand you do not wish to have any meaningful discussions then I will

arrange for the service of the complaint." (GLX 17-18)

42.     Herzig forwarded Thomas's email and attachments to Jamie Crystal, the principal

of his insurance broker, Crystal & Company.  Herzig wrote:  "Just received this love letter from

the brilliant insurer with whom you placed this policy.  My attorney is preparing a response but

he suggested I discuss with you as perhaps a heads up call from you to them will be more

productive.  If they thought sending me this empty threat was going to intimidate me, they chose

the wrong guy.  Plus, their draft complaint is so full of holes that it's laughable.  This email

evidently gives me even stronger cause to file a lawsuit in Florida claiming actions in bad faith,

so maybe I should be thanking them for sending instead of laughing."  (GLX 18 at 1)

43.     In a December 27, 2016 letter to Concept Claims Manager Mark Thomas

(transmitted via email), Adam Heffner – representing Herzig – reiterates Herzig's $300,000

counteroffer.  Heffner states:  "In the event that payment is not received from you by tomorrow

at 5:00 p.m. EST, the subject offer will be automatically withdrawn."  (GLX 19 at 3)

44.     Goldman – representing Great Lakes – replies to Heffner in a December 28, 2016

letter transmitted by email at 10:48 a.m.:  "[B]e advised that in the event you ever again see fit to

contact or communicate with my client in this pending litigation, I will not hesitate to bring such

action to the attention of the Florida Bar. . . . Be advised that there will be no further or

additional sums offered by way of settlement in this matter.  Furthermore, now that the coverage

dispute has gone into litigation, please be advised that the offer of $175,000.00 reference[d] in

Mr. Thomas' letter of December 23, 2016 will be withdrawn in the event Mr. Herzig choose[s]

to contest the Complaint for Declaratory Judgment which is now pending in federal district court

in Manhattan . . . . I will now look forward to receiving your timely advices confirming Mr.

Herzig's decision to accept the offer in the amount of $175,000.00."  (GLX 22)

45.    At trial, Goldman was asked: "What do you mean by timely advice[s]?"  He responded as follows:

> I left that open.  Again, he could have responded with a request to – for an extension on the complaint.  I didn't put a time limit.  I didn't say this offer is open until and closed such and such a date, which is something I routinely do in lots of other coverage matters.  So my instructions were to try to settle this.  This wasn't something we were looking forward to litigating.  It wasn't something interesting like a breach of warranty case or material misrepresentation case.  This is something where my client wanted it settled.  Those were my instructions.  So what I was saying was please get back to me, and we'll settle this case, but there's no time limit.  As I said, I routinely in certain matters say this is only open such and such a time until close of business.  That is a note that is not here.  This says what it says, counselor.

(Tr. at 120)

46.    Goldman and Heffner continued to "exchange[] emails and calls on December 28 and 29, 2016."  (Stip. (Dkt. No. 143-2) ¶ 11)  The emails indicate that Heffner accepted the $175,000 settlement offer at some time before 12:15 p.m. on December 28, 2016.  (GLX 21 at 4)  Goldman and Heffner continued to negotiate how long the Policy would remain in effect, however.

47.    On December 29, 2016, in a 9:05 a.m. email, Goldman transmits a "final settlement offer."  (Id. at 1)  Goldman states that Great Lakes will pay Herzig $175,000 and maintain the Policy, "with coverage limited to Port Risk only, for a period of 30 days."  Goldman adds:

> [P]lease understand that this is a final settlement offer, and that no different or better terms will be forthcoming.  Rejection of this good faith offer will result in the immediate cancellation of [the Policy], followed by service of the Complaint for Declaratory Judgment filed in federal district court in NYC.

(Id.)  Goldman does not set a deadline for Herzig to respond to Great Lakes' "final offer."

48.    In a December 29, 2016, 9:40 a.m. email to Heffner, Goldman attaches the November 2016 Endorsement and states:

One final matter has been brought to my attention, counselor. During the 30 days of continued coverage, on Port Risk only, the insured value of the vessel would be $125,000.00. In this regard, please note that I am attaching hereto the [November 2016 Endorsement] reducing the Hull Sum Insured to $300,000.00. . . . With an Agreed Value of $300,000.00 per the attached endorsement, and with a pending claim for damages amounting to $175,000.00, the insured value of the vessel during the 30 days of continued coverage would be the figure of $125,000.00 referred to above.

(Id.)

49.    At trial, Goldman was asked about his communications with Heffner regarding

the retroactivity of the November 2016 Endorsement. Goldman testified as follows:

Q. Did Mr. Heffner, at any time – please answer yes or no – did Mr. Heffner at any time ask you if the November 2016 endorsement was retroactive?

A. No.

Q. Did he ever ask you for clarification as to whether or not it was retroactive?

A. No.

Q. Did he express any confusion to you about whether or not it was retroactive?

A. No.

Q. And again, did you represent to him that it was retroactive?

A. No.

(Tr. at 157)

50.    At trial, the Court questioned Herzig about his contemporaneous interpretation of

the November 2016 Endorsement, and whether he understood at the time that it became effective

as of November 18, 2016:

THE COURT: . . . [W]hen you first saw the document, the policy endorsement [dated] November 18, 2016, are you telling us that you did not understand the language "with effect from Friday, November 18, 2016" to mean that the endorsement became effective on Friday, November 18, 2016? Is that what you're telling us?

> THE WITNESS: I would logically think that, yes, it became effective as of that date based on that reading of language. These documents are not familiar to me, but yes to your question, that would be my answer to your question.

(Id. at 78-79)

51.     In a December 29, 2016, 11:21 a.m. email to Goldman, Heffner states: "Please be advised that my client is signing the release and I will email you the executed document shortly. The original will follow [b]y mail. Please overnight the settlement check . . . . Additionally, pursuant to the [November 2016 Endorsement], which my [client] had never seen before, a return in premium is due my client in the amount of $1,954.00. Please inquire as to the status of this as my client has never received it." (GLX 23)

52.     About 20 minutes later, Goldman replied: "As I advised, the return premium in the amount of $1,945.00 was credited back to your client's broker. I would therefore respectfully suggest that your inquiries in this regard be directed to the latter." (Id.)

53.     Goldman testified that his response was based on "ask[ing] [Concept's] Usher, has this [$]1,954 [refund] been done . . . sometime between getting the file and informing Mr. Heffner about what I thought had become of the [$]1,954." (Tr. at 144) Goldman questioned Usher about the premium refund because he was not "intimately familiar" with how surplus lines insurers accounted for refunds. (Id.)

54.     Goldman was also asked whether Herzig received the November 2016 Endorsement before he signed the Release:

> Q. Sitting here today, do you have any reason to believe that Mr. Herzig received the endorsement at any time before he signed the release on December 29th, Mr. Herzig himself?
>
> A. I have no idea what Mr. Heffner or Mr. Poplawsky might have given to Mr. Herzig. My client's job was to get the endorsement and return of premium to the surplus lines broker, not to Mr. Herzig personally, not to Mr. Heffner personally and not to Crystal personally. My client only dealt with – per the custom and the law of New York State – with the surplus lines broker. So I don't know. I don't

know what Mr. Herzig had or knew.  He may have been ill served by his brokers,
I really don't know.

Q. You don't know one way or the other?

A. No, I don't.

Q. And you undertook no efforts at the time to determine whether he had?

A. That is correct.

. . . .

Q. When you spoke to Mr. Usher about the premium refund, were you – to . . .
use your words – curious about whether Mr. Herzig had agreed to the
endorsement itself, reducing the value to $300,000?

A. No.

Q. Why are you so sure about that?

A. I don't remember quizzing anybody about why or whether that could be done
unilaterally.  Again, that wasn't how I viewed my role, my job in this matter.  No,
I didn't.  I didn't pursue that, no.  I really don't recall – I'm trying to be helpful,
which is probably foolish – but I really don't recall.  I have no independent
recollection.

(Id. at 142-43, 144-45)

    55.    Herzig was copied on Goldman's email to Heffner reporting that the premium

refund "of $1,945.00 was credited back to your client's broker."  (GLX 23)  Herzig forwarded

the email to his insurance broker Poplawsky at Crystal later on December 29, 2016 (copying

Jamie Crystal), stating:  "Is the below true?  Did you receive the endorsement to the policy and

the refund back in November?  I never received a copy of the November 18 policy endorsement

reducing the value of my insurance from $600,000 to $300,000."  (HX BX)  Herzig testified that

he also called Crystal and left voicemails.  But no one from Crystal returned Herzig's call that

day.  (Tr. at 43-47; HX DE ¶ 31)

**THE RELEASE**

56.    "On December 29, 2016, Herzig signed the Release."  (Stip. (Dkt. No. 143-2)

¶ 12)  The operative paragraph of the Release reads as follows:

> FOR AND IN CONSIDERATION of the return of premium, payment of which is being made to me at this time of the sum of One Hundred Seventy-Five Thousand Dollars and zero cents ($175,000.00), the receipt of which is hereby acknowledged, I, PETER HERZIG, (hereinafter the "Releasor"), being of lawful, age and sui juris, do hereby release, acquit and forever discharge GREAT LAKES REINSURANCE (UK) SE and CONCEPT SPECIAL RISKS LTD., and the latters' employees, agents, heirs, executors, administrators, successors and assigns, (the "Releasees"), of and from any and all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands whatsoever, in law, admiralty, or equity which the Releasors, the Releasors' heirs, executors, administrators, and assigns ever had, now have, or hereafter can, shall, or may have for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of this release, including, but not limited to, any and all actions, causes of action, claims, demands, damages, costs, loss of services, expenses and compensation, on account of, or in any way growing out of, any and all known and unknown damage and/or property damage resulting or to resulting from the incident and the resulting claim for insurance coverage involving the 1997 62 ft Sunseeker vessel named "CRESCENDO" insured under Policy No. CSRYP/156842, which is alleged to have occurred on or about October 7, 2016, at or during which time it is contended that the said vessel sustained damage as a result of an incident which is alleged to have occurred as a result of the passage of Hurricane Matthew, which incident and resulting claim under the referenced policy was the subject of the Complaint in Case No. 16-CV-09848-PGG in the United States District Court for the Southern District of New York, titled Great Lakes Reinsurance (UK) SE v. Peter Herzig.

(GLX 24 at 1)

57.    That same day – December 29, 2016 – Goldman's law firm issued a check to Herzig in the amount of $175,000 from its trust account.  (GLX 25)

**POST-RELEASE EVENTS**

58.    On December 30, 2016, Crystal insurance broker Poplawsky replied to Herzig's email of the previous day, stating:

Back in November, we were advised that the carrier was looking to have the value of the vessel reduced to $300k. At that time, the change was not filed through the state. While we knew the value reduction would not have an [e]ffect on the claim, we were pushing for the claim to be settled first before a final decision was made on the endorsement as well as request[ing] further documentation supporting the reduction in the hull value. As this change in value was prompted by the insurer and not you, we had been advocating for the change to be voided. At this time they have advised that they would not accept any further deliberation. I will request the refund of $1,954 to be released from the wholesaler. The value of the vessel will be $300k for the duration of the policy.

(HX CA at 2)

59.    The Excess Line Association stamped the November 2016 Endorsement that same day – December 30, 2016 – and Quaker sent the stamped November 2016 Endorsement to Poplawsky on January 3, 2017. (GLX 27 at 4-5)

**DAMAGES**

60.    Herzig alleges that – following the October 7, 2016 damage to the Crescendo – he incurred the following out-of-pocket costs:

| Out-of-Pocket Cost | Amount |
|---|---|
| Legal Fees | $635,907.79 |
| Dockage Fees | $173,295.68 |
| Alternative Housing Costs | $2,019,044.36 |
| Maintenance Costs | $213,665.06 |
| Total | $3,041,912.89 |

(HX CT at 2)

61.    The $213,665.06 in "maintenance costs" is based on Herzig's unsupported assertion that he "ha[s] been given an estimate of the costs for the necessary overhauling, repairs,

and follow-up commission testing of Crescendo, and it totals more than $230,000." (HX DE ¶ 50) He offers no support for this number.

62.     "Alternative housing costs" means hotel and vacation rental expenses Herzig asserts that he incurred as a result of the damage to the Crescendo, including a five-day, $11,983.54 stay at the Four Seasons, Beverly Hills in August 2017. (HX CS at 30-31) Herzig refers to these travel arrangements as "land-based accommodations," and states that "[t]hese expenses are significantly less than the amount we would have incurred if I had engaged in yacht-based (apples to apples) alternative accommodations as a replacement for having access to Crescendo." (HX DE ¶ 48)

**WITNESS CREDIBILITY DETERMINATIONS**

63.     Herzig and Goldman were the only witnesses at trial.

64.     Herzig was not a credible witness. His testimony was largely unsupported and sometimes contradictory. And to the extent Herzig asserted that Steven Goldman – Great Lakes' counsel – had made misrepresentations to Herzig's lawyer – the late Adam Heffner – regarding the November 2016 Endorsement and the premium refund made to Herzig's insurance broker (see Herzig Proposed Findings of Fact and Conclusions of Law (Dkt. No. 151) ¶ 162), Herzig lacked personal knowledge of what Goldman had said to Herzig's lawyer.

65.     Among Herzig's unsupported assertions was his claim – in his declaration – that "[d]uring [his pre-litigation] negotiations with Great Lakes' representatives, we had discussed a deadline of December 30" for Herzig to accept Great Lakes' settlement offer. (HX DE ¶ 20)

66.     On cross-examination, however, Herzig could not say who had made such a representation to him or identify any communication in which that representation was made. The Court then took a "luncheon recess . . . [to] give Mr. Herzig an opportunity to refresh his

recollection, if there is any document that can refresh his recollection." After the recess, Herzig could not cite any document supporting the statement in his declaration, and conceded that there was "[n]o direct communication" from a Great Lakes representative "indicating December 30 was a deadline." (Tr. at 91-100)

67.    Herzig also stated in his declaration that – had Great Lakes canceled insurance coverage for the Crescendo on December 30 – "it would be very difficult, if not impossible, to [assemble self-insurance] within 10 days." (HX DE ¶ 25) But Herzig never provided a factual basis for this assertion, and never explained what "assembl[ing] self-insurance" consisted of. And given that the Policy provides that it "may be cancelled by either you or us at any time, subject to 10 days prior written notice" (GLX 3 § 9(e)), the parties clearly contemplated that Herzig might be called upon to arrange substitute coverage on ten days' notice.

68.    In sum, Herzig was not a credible witness at trial.

69.    By contrast, Goldman was a credible witness. His testimony was generally internally consistent, as well as consistent with the documentary evidence.

## CONCLUSIONS OF LAW

I.    **LEGAL STANDARDS**

A.    **Burden of Proof**

1.    "To prevail on [his] claims, [Herzig] has the burden of proof to present evidence in support of the allegations set forth in [his counterclaims] and to prove those allegations by a preponderance of the evidence. 'The burden of showing something by a preponderance of the evidence . . . simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence.' As the finder of fact, the Court is entitled to make credibility findings of the witnesses and testimony." C=Holdings B.V. v. Asiarim Corp., 992 F. Supp. 2d

223, 232 (S.D.N.Y. 2013) (first citing McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co., 938

F.2d 1544, 1548-49 (2d Cir. 1991); then quoting Metro. Stevedore Co. v. Rambo, 521 U.S. 121,

137 n.9 (1997)) (further quotations omitted).

**B.    Fraud and Rescission with Respect to a Release[3]**

2.      "It is well established that a valid release constitutes a complete bar to an action

on a claim which is the subject of the release.  However, a release may be set aside on the

traditional bases of fraudulent inducement, fraudulent concealment, misrepresentation, mutual

mistake or duress.  In order to set aside a release on such grounds, a plaintiff must establish the

basic elements of fraud, namely a representation of material fact, the falsity of that

representation, knowledge by the party who made the representation that it was false when made,

justifiable reliance by the plaintiff, and resulting injury.  Absent any of the elements, [the

claimant] does not have a prima facie case." Glob. Mins. & Metals Corp. v. Holme, 35 A.D.3d

93, 98 (N.Y. App. Div. 2006) (internal citations omitted).

3.      "In New York, a party who entered into a contract induced by fraudulent

representations" is entitled to money damages and/or rescission.  Fitzgerald v. Title Guarantee &

Tr. Co., 49 N.E.2d 489, 489 (N.Y. 1943).

**C.    Breach of Contract[4]**

4.      Under New York law, the elements of a breach of contract claim are "'(1) the

existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach

of contract by the defendant, and (4) damages.'"  Mindspirit, LLC v. Evalueserve Ltd., 346 F.

---

[3] The parties have stipulated that "New York law determines the enforceability of the Release."
(Stipulated Law (Dkt. No. 143-2) ¶ 1)

[4] Both parties cite to New York law for the elements of a breach of contract claim.  (Herzig Post-
Trial Br. (Dkt. No. 169) at 64; Great Lakes Post-Trial Br. (Dkt. No. 168) at 34)

Supp. 3d 552, 573-74 (S.D.N.Y. 2018) (quoting Ellington Credit Fund, Ltd. v. Select Portfolio

Servicing, Inc., 837 F. Supp. 2d 162, 188-89 (S.D.N.Y. 2011)).

## II.    THE PRECLUSIVE EFFECT OF THIS COURT'S SUMMARY JUDGMENT OPINION

### A.    Issue Preclusion and Law of the Case

5.    "The doctrine of collateral estoppel, which is also known as issue preclusion, bars

a party from re-litigating in a second proceeding a factual or legal issue that has already been

decided against him in a prior proceeding. . . . Collateral estoppel attaches where (i) an identical

issue was raised in a previous proceeding against the party; (ii) the issue was actually litigated

and decided in the previous proceeding; (iii) the party had a full and fair opportunity to litigate

the issue; and (iv) resolution of the issue was necessary to support a valid and final judgment on

the merits.  Courts have broad discretion to determine whether collateral estoppel applies."

Ferring B.V. v. Serenity Pharms., LLC, 391 F. Supp. 3d 265, 281-82 (S.D.N.Y. 2019) (citing

Flood v. Just Energy Mktg. Corp., 904 F.3d 219, 236 (2d Cir. 2018); further citations omitted).

In sum, the collateral estoppel doctrine "prevents a party from re-litigating certain factual issues,

even in the context of different legal claims." Id. at 283.

6.    "[T]he concept of finality for collateral estoppel purposes 'includes many

dispositions which, though not final in that sense, have nevertheless been fully litigated.'

Whether a judgment that is not final within the meaning of [28 U.S.C.] § 1291 'ought

nevertheless be considered "final" in the sense of precluding further litigation of the same issue,

turns upon such factors as the nature of the decision (i.e., that it was not avowedly tentative), the

adequacy of the hearing, and the opportunity for review.'" Metromedia Co. v. Fugazy, 983 F.2d

350, 366 (2d Cir. 1992) (quoting Zdanok v. Glidden Co., 327 F.2d 944, 955 (2d Cir. 1964), and

Lummus Co. v. Commonwealth Oil Ref. Co., 297 F.2d 80, 89 (2d Cir. 1961)).

7.      Applying these principles, courts in this Circuit have held that a partial grant of summary judgment has collateral estoppel effect as to the issue on which the court ruled, provided that the summary judgment opinion was thorough, that the parties had an opportunity to be heard, and that the circumstances of the summary judgment opinion indicate that the court intended it to be final with respect to the issue on which the court granted summary judgment. See, e.g., Ferring, 391 F. Supp. 3d at 284-90; USM, Inc. v. Barretta Enterprises, No. 3:15CV1537 (DJS), 2016 WL 5339719, at *2-6 (D. Conn. Sept. 21, 2016); U.S. Dep't of Just. v. Hudson, No. 1:06-CV-763, 2007 WL 2461783, at *4-5 (N.D.N.Y. Aug. 24, 2007), reconsideration granted on other grounds, 2009 WL 7172812 (N.D.N.Y. July 8, 2009); United States v. McGann, 951 F. Supp. 372, 382 (E.D.N.Y. 1997); Georgakis v. E. Air Lines, Inc., 512 F. Supp. 330, 334 (E.D.N.Y. 1981).

8.      "The doctrine of law of the case is similar to the issue preclusion prong of res judicata in that it limits relitigation of an issue once it has been decided.  However, law of the case is concerned with the extent to which law applied in a decision at one stage of litigation becomes the governing principle in later stages of the same litigation. . . . 'As most commonly defined, the doctrine [of law of the case] posits that when a court decides upon a rule of law, that decision should [generally] continue to govern the same issues in subsequent stages in the same case.'" Rezzonico v. H&R Block, Inc., 182 F.3d 144, 148-49 (2d Cir. 1999) (quoting Arizona v. California, 460 U.S. 605, 618 (1983)) (brackets in original).

9.      "The doctrine of the law of the case is not an inviolate rule, and the decision whether or not to apply law-of-the-case is, in turn, informed principally by the concern that disregard of an earlier ruling not be allowed to prejudice the party seeking the benefit of the doctrine," where prejudice is defined with reference to "lack of sufficiency of notice." United

States v. Uccio, 940 F.2d 753, 758 (2d Cir. 1991) (internal citations and quotations omitted). There must be "cogent or compelling reasons to deviate" from a court's prior ruling, such as "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." Id. (quotations omitted).

10.     Under the law of the case doctrine, summary judgment rulings apply at a subsequent trial. See Rhee-Karn v. Lask, No. 15-CV-9946 (RWL), 2023 WL 3626038, at *1 (S.D.N.Y. May 24, 2023) ("[The court] not only granted summary judgment finding [defendant] liable for malpractice, but . . . also denied [defendant's] motion for reconsideration. . . . [Defendant] has not presented to the [c]ourt any basis for disregarding or departing from [the summary judgment] decision. Accordingly, [defendant] is precluded from arguing or presenting evidence at trial that [she] did not commit malpractice in connection with the First Federal Action.").

**B.      Analysis**

11.     At trial, Herzig argued that Great Lakes – acting through its lawyer Steven Goldman – made three false statements that amounted to fraudulent inducement:  (1) that the November 2016 Endorsement "was in place and valid"; (2) that the November 2016 Endorsement was valid because "the return premium in the amount of $1,954.00 was credited back to [Herzig's] broker"; and (3) that the November 2016 Endorsement "applied to [Herzig's] pending claim." (Herzig Post-Trial Br. (Dkt. No. 169) at 47-53)

12.     As this Court explained "[i]n granting Great Lakes summary judgment on its Second Cause of Action, [however,] . . . Goldman's alleged misrepresentations were not material representations upon which Herzig reasonably relied [in executing the Release]." In the

summary judgment opinion, the Court went on to hold that the Release is a valid and binding contract.  Herzig, 2023 WL 3560578, at *32; see id. at *22, *24, *25, *27, *30.

13.      Those findings are law of the case, and Herzig has offered no reason – whether factual or legal – for this Court to abandon these findings, which were the product of extensive litigation in which Herzig had ample opportunity to submit evidence and argument, and with respect to which this Court has previously denied reconsideration.  (See Reconsid. Op. (Dkt. No. 154))  Moreover, the evidence at trial was consistent with the summary judgment record, and there is no manifest injustice in holding Herzig to the Release he signed.

14.      In sum, Herzig has not demonstrated that he reasonably relied on fraudulent misstatements made by Great Lakes' counsel Goldman.  Accordingly, Herzig's First and Second Counterclaims – for fraud and rescission – fail.

15.      As to Herzig's breach of contract counterclaim, this Court's finding that the Release is valid precludes Herzig's contract claim.  The Release bars Herzig from recovering any "damages . . . on account of, or in any way growing out of, any and all known and unknown damage and/or property damage resulting or to resulting from the incident and the resulting claim for insurance coverage involving the 1997 62 ft Sunseeker vessel named 'CRESCENDO' insured under Policy No. CSRYP/156842, which is alleged to have occurred on or about October 7, 2016."  (GLX 24 at 1)

16.      According to Herzig's Third Counterclaim, Great Lakes breached the Policy when it issued the November 2016 Endorsement.  (Answer to SAC (Dkt. No. 49) at pp. 19-20)  Herzig contends that "the endorsement arose only because Herzig had made his [insurance] claim" (Tr. at 39), and his theory of contract damages is that the November 2016 Endorsement "was the primary reason that Herzig agreed to the Release, which caused him substantial

damages." (Herzig Post-Trial Br. (Dkt. No. 169) at 73)  Great Lakes' alleged breach and Herzig's purported damages thus both "grow[] out of . . . the [damage to the Crescendo] and the resulting claim for insurance coverage." (GLX 24 at 1)

17.    Herzig's breach of contract counterclaim is barred by the plain language of the Release. See Alvarez v. Amicucci, 82 A.D.3d 687, 688 (2d Dept. 2011) (holding that a release that is "complete, clear, and unambiguous on its face must be enforced according to the plain meaning of its terms"; given the "clear, unambiguous language of the [release], parol evidence cannot be considered to alter or vary its terms"); accord Sharon v. 398 Bond St., LLC, 169 A.D.3d 1079, 1080 (2d Dept. 2019); Burgos v. N.Y. Presbyterian Hosp., 155 A.D.3d 598, 600 (2d Dept. 2017).

18.    For the reasons stated below, all of Herzig's claims fail on the merits, even absent the summary judgment decision and the Release.

## III.    LIABILITY

### A.    Whether Great Lakes Induced the Release Through Fraud

#### 1.    Falsity

19.    At summary judgment, this Court concluded that Herzig had "not raised a material issue of fact as to whether he was defrauded in connection with Goldman's alleged misrepresentation that the November 2016 Endorsement applied retroactively." Herzig, 2023 WL 3560578, at *24.  The documentary evidence and credible testimony at trial – including Goldman's clear denial that he ever stated that the Endorsement applied retroactively (see Tr. 156-57) – are fully consistent with the summary judgment record.  In sum, Herzig's fraudulent inducement claim fails to the extent it is based on Herzig's assertion that Goldman represented that the November 2016 Endorsement applied retroactively to his October 7, 2016 claim.

20.    The Court also finds that Goldman's statement on December 29, 2016 that a return of premium had been credited to Herzig's broker (GLX 23) was true, because the premium had been credited to Quaker Special Risks on November 18, **2016** (HX R), and Quaker was Herzig's agent under the terms of the Policy (see GLX 3 at p.1 and § 9(h)).

21.    Goldman's implicit representation on December 29, 2016 that the Endorsement was in effect from November 18, 2016 forward (GLX 21 at 1) was false, however.

An endorsement that changes a material term of an insurance policy – such as the coverage limit – requires the consent of the insured.  See Danzig v. Dikman, 78 A.D.2d 303, 305-06, 309 (1st Dept. 1980) (holding that a "modification [to a group health insurance policy] changing the lifetime maximum for expenses for private-duty nursing care from 'unlimited' to $5,000 [was] ineffective" because the insurer had not "obtain[ed] the consent of [the insureds] to such modification"), aff'd, 53 N.Y.2d 926 (1981); see also GEICO Marine Ins. Co. v. Monette, 438 F. Supp. 3d 763, 766-68 (E.D. Ky. 2020) (holding that an endorsement changing the limit of marine insurance contract was invalid because the policyholder had not consented to the change); 2 Couch on Ins. §§ 25:17, 25:24 (3d ed. Nov. 2022 update) (explaining that a change in coverage is the type of modification to an insurance policy that requires the consent of the insured).

Moreover, under New York law, the November 2016 Endorsement had to be stamped by the Excess Line Association in order to be effective.  N.Y. Ins. Law § 2118(b)(6).  Here, the evidence at trial showed that the November 2016 Endorsement was not stamped by the Excess Line Association until December 30, 2016.  Therefore, the Endorsement was not in effect as of December 29, 2016 when Herzig executed the Release.

2.    **Scienter**

22.    To prevail on his fraud claim, Herzig must demonstrate that Goldman's misstatement was "knowingly false." Elite Physician Servs., LLC v. Citicorp Payment Servs., Inc., No. 06 CIV. 2447 (BSJ), 2009 WL 10669137, at *6 (S.D.N.Y. Oct. 9, 2009) (quoting Junk v. Aon Corp., No. 07 Civ. 4640, 2007 U.S. Dist. LEXIS 89741, at *18-19 (S.D.N.Y. Dec. 3, 2007)). A party may demonstrate knowledge of falsity by demonstrating that the speaker "kn[ew] [the statement] to be untrue or made [the statement] with reckless disregard for the truth." McCormack v. IBM, 145 F. Supp. 3d 258, 268 (S.D.N.Y. 2015) (quoting Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 580 (2d Cir. 2005)). Goldman is the only Great Lakes agent alleged to have made fraudulent misstatements to Herzig. Accordingly, if Goldman "did not have an intent to defraud . . . there is no scienter . . . to impute to the Company." Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp., 433 F. Supp. 3d 515, 549 n.25 (S.D.N.Y. 2020).

23.    There is no evidence, however, that Goldman was informed of, or otherwise aware of, Concept's dispute with Quaker regarding the November 2016 Endorsement. Goldman testified that he never asked Concept's Usher whether Herzig had agreed to the November 2016 Endorsement, and this Court finds Goldman's testimony credible. As Goldman explained at trial, it was not his "role" or his "job" in connection with his representation of Great Lakes to determine whether Herzig had agreed to the November 2016 Endorsement. Nor was it Goldman's concern whether Herzig had been "ill served by his brokers." (Tr. at 142-43, 145)

24.    The Court further concludes that Goldman's implicit misrepresentation that the November 2016 Endorsement was in effect as of December 29, 2016 was negligent, at most. There is no evidence that Goldman was aware that Herzig had not agreed to the Endorsement, nor is there any evidence that Goldman knew that the Endorsement was not valid on December

29, 2016, because it had not yet been stamped by the Excess Line Association.  In sum, there is

no evidence that Goldman acted with the requisite scienter.

### 3.    Reasonable Reliance

25.    Even if there had been evidence at trial that (1) Goldman explicitly stated that the

November 2016 Endorsement was retroactive; (2) no return of premium had been credited to

Herzig's agent; and (3) Goldman's alleged misstatements were knowingly false, Herzig's fraud

and rescission counterclaims would still fail, because – for much the same reasons explained at

summary judgment – Herzig did not demonstrate that he reasonably relied on Goldman's alleged

misstatements.

26.    Herzig conceded at trial that – based on the plain language of the November 2016

Endorsement – he "would logically think that . . . it became effective as of [November 18,

2016]."  (Tr. at 78-79)  Given that the Crescendo was damaged on October 7, 2016 (Stip. (Dkt.

No. 143-2) ¶ 4), it would not have been reasonable for Herzig to place any reliance on statements

from Goldman suggesting that the November 2016 Endorsement applied retroactively to his

October 7, 2016 insurance claim.  See Robinson v. Deutsche Bank Tr. Co. Americas, 572 F.

Supp. 2d 319, 323 (S.D.N.Y. 2008) ("New York courts have determined as a matter of law that a

party's reliance was unreasonable where the alleged misrepresentation is explicitly contradicted

by the written agreement."); Compania Sud-Americana de Vapores, S.A. v. IBJ Schroder Bank

& Tr. Co., 785 F. Supp. 411, 419-21 (S.D.N.Y. 1992) (holding "as a matter of law, that

[plaintiff's] reliance on [defendant bank's] alleged misrepresentations was unreasonable" where

(1) plaintiff's "claim [was] based upon the difference between the rate charged by [the bank] and

the interbank rate . . . allegedly promised by [the bank to plaintiff]"; and (2) "[a]t all relevant

times, [plaintiff] had access to both relevant rates . . . [because] [t]he rate charged by [the bank]

was confirmed in writing to [plaintiff] . . . and the interbank foreign exchange rates were

available in daily newspapers"); <u>Marine Midland Bank v. Palm Beach Moorings, Inc.,</u> 61 A.D.2d 927 (1st Dept. 1978) (affirming grant of summary judgment to plaintiff bank regarding defendant's obligation to bank because – although defendant argued that a "vice president of the plaintiff bank" had made oral misrepresentations to induce defendant to contract – "it [was] not denied that the defendant . . . had the opportunity to examine the [bank's] corporate records before assuming the obligations reflected in the agreement").

27.     Herzig has therefore not established reasonable reliance.

28.     For all these reasons, this Court finds in favor of Great Lakes on Herzig's fraudulent inducement and rescission counterclaims.

**B.    <u>Whether Great Lakes is Liable for Breach of Contract</u>**

29.     The Release bars Herzig's breach of contract counterclaim for the reasons discussed above in connection with law of the case.  In any event, the evidence offered at trial did not support Herzig's breach of contract counterclaim.

30.     Herzig contends that Great Lakes – by issuing the November 2016 Endorsement – breached (1) the "Agreed Value" definition in the Policy; (2) the statement in the "Concept Special Risks Claim Leaflet" that "We are committed to treating customers fairly as a matter of good business and fair dealing"; and (3) the statement in the "Concept Special Risks Claim Leaflet" that Concept's "[P]olicy documentation will be in accordance with market and regulatory standards."  (Herzig Post-Trial Br. (Dkt. No. 169) at 66-73; GLX 3 § 1(t) and p. 18)

31.     As to the Policy's definition of "Agreed Value," the Court finds that the November 2016 Endorsement is ineffective under that provision, because the new coverage limit specified in the Endorsement does not reflect an "agreed value."  <u>Danzig</u>, 78 A.D.2d at 305-06, 309 (unconsented-to endorsement held invalid).  But Herzig cites no authority for the proposition

that the issuance of an invalid endorsement – such as an endorsement that has not been mutually

agreed upon – is a breach of the underlying insurance policy.

32.    The remaining two provisions cited by Herzig – taken from the Concept Special

Risks Claim Leaflet – do not provide a basis for a breach of contract claim.

33.    As an initial matter, Concept's alleged commitment to "treating customers fairly"

is puffery, and is not an enforceable contract term.  See Sinanovic v. Wagner Coll., No. 20-CV-

5181 (LDH), 2022 WL 4644238, at *5 (E.D.N.Y. Oct. 1, 2022) (holding that stated commitment

to "culturally and socially diverse communities" and "hands-on learning" were "mere opinion or

puffery . . . too vague to be enforced"); Thomas v. Vigilant Ins. Co., 594 F. Supp. 3d 499, 509

(D. Conn. 2022) (describing puffery as "broad, subjective statements . . . not, in other words,

statements of fact or concrete promises of future action that [are] specific to the relationship

between the parties").

34.    As to Concept's representation that "policy documentation will be in accordance

with market and regulatory standards," Herzig has not identified – in the first instance – the

"market and regulatory standards" the Court should look to.  Herzig cites N.Y. Insurance Law

§ 2118(b)(6), which provides that it is unlawful to "deliver in this state any declarations page of

an insurance policy or cover note evidencing insurance unless such insurance document is

stamped by the excess line association or is exempt from such requirements[.]"  (Herzig Post-

Trial Br. (Dkt. No. 169) at 72)  Assuming arguendo that an endorsement falls within this

provision, Herzig has not cited any case suggesting that a violation of Section 2118(b)(6)

constitutes a breach of the underlying policy.  And while an insurance broker may be liable for

breach of fiduciary duty based on technical violations of § 2118, see E. Coast Mgmt. Ltd. v.

Genatt Assocs., Inc., 9 Misc. 3d 440, 445 (Nassau Cnty. Sup. Ct. 2005), the statute does not

"confer[] a private cause of action to enforce its provisions." Polly Esther's S., Inc. v. Setnor Byer Bogdanoff, 10 Misc. 3d 375, 386 (N.Y. Cnty. Sup. Ct. 2005).

35.    In addition to Herzig's failure to demonstrate a breach of the Policy, he has not satisfied the required element of damages.  As stated above, Herzig's damages theory regarding the issuance of the November 2016 Endorsement is that the document induced him to enter into an unfavorable settlement – i.e., consequential damages.  (Herzig Post-Trial Br. (Dkt. No. 169) at 73-75)  But an insurer is liable for consequential damages flowing from the breach of an insurance policy only where such damages were "'within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting.'"  Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of New York, 10 N.Y.3d 187, 192-93 (2008) (quoting Kenford Co. v County of Erie, 73 N.Y.2d 312, 319 (1989)).  Moreover, "proof of consequential damages cannot be speculative or conjectural." Id.  Given that the November 2016 Endorsement did not retroactively apply to Herzig's October 7, 2016 insurance claim, Herzig's contention that the Endorsement caused him to accept a settlement he would otherwise have rejected is far outside the "probable result[s]" of the Endorsement, and does not entitle him to consequential damages.

36.    For these reasons, Herzig has not demonstrated either a breach of the Policy or damages flowing from such a breach.  Accordingly, Great Lakes is entitled to judgment on Herzig's breach of contract counterclaim.[5]

---

[5] Herzig moved for an adverse inference based on Great Lakes' failure to produce Concept's Usher at trial. (Herzig Post-Trial Br. (Dkt. No. 169) at 42-47)  That motion is denied, because (1) Herzig did not make out a prima facie case at trial; and (2) Usher's testimony would have been cumulative of his deposition testimony. See Vanity Fair Paper Mills, Inc. v. F.T.C., 311 F.2d 480, 486 (2d Cir. 1962); Williams v. Arctic Cat, Inc., No. 3:11-CV-445, 2014 WL 1028476, at *11 (N.D.N.Y. Mar. 13, 2014); United States v. Caccia, 122 F.3d 136, 139 (2d Cir. 1997).

## IV.    **DAMAGES**

37.    Given the Court's finding that Great Lakes is not liable on any of Herzig's counterclaims, his request for damages is moot.  The Court notes, however, that many components of his damages claim would fail in any event.  For example, Herzig seeks punitive damages and an award of attorneys' fees, but the evidence here does not satisfy the stringent standards for either type of award.  See D.K. Prop., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 59 Misc. 3d 714, 721 (N.Y. Sup. Ct. 2018) ("[I]t has long been held that an insured may not recover the legal fees it incurs in bringing an action to settle its rights in an insurance policy. . . . However, a narrow exception exists where the insured can prove that the carrier had no arguable basis to challenge its claim and can further show that no reasonable carrier would, under the given facts, challenge the claim.") (citing Mighty Midgets v. Centennial Ins. Co., 47 N.Y.2d 12, 21 (1979); Sukup v. State of New York, 19 N.Y.2d 519, 522 (1967)), rev'd on other grounds, 168 A.D.3d 505 (1st Dept. 2019); Rocanova v. Equitable Life Assur. Soc. of U.S., 83 N.Y.2d 603, 613 (1994) (holding that punitive damages are available in breach of contract cases only "where the breach of contract also involves a fraud evincing a high degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations, . . . [and] the conduct was aimed at the public generally") (quotations omitted); Steinhardt Grp. Inc. v. Citicorp, 272 A.D.2d 255, 257 (1st Dept. 2000) (applying Rocanova standard to a fraudulent inducement claim); Whitney v. Citibank, N.A., 782 F.2d 1106, 1118 (2d Cir. 1986) ("[P]unitive or exemplary damages may be awarded where the defendant's conduct amounts to such gross, wanton or willful fraud, dishonesty, or malicious wrongdoing as to involve a high degree of moral culpability, making it appropriate to deter the defendants from engaging in similar conduct in the future and to induce the victim to take action against the wrongdoer.").

38.    Herzig also seeks damages flowing from the loss of use of the Crescendo, including expenses associated with maintenance, docking, and travel.  These expenses are not recoverable, either under the Policy or as a matter of admiralty law.  As to the Policy, it explicitly excludes coverage for "[y]our personal expenses or those of your family including but not limited the, cost of your own labour, hotel or accommodation costs, car rental and communication costs . . . [and] [l]osses caused by delay in repairs and/or loss of use and/or enjoyment of the Scheduled Vessel and/or its equipment."  (GLX 3 §§ 3(b), (j), and (k))  The loss of use of a pleasure vessel such as the Crescendo is also not compensable under admiralty law.  See CTI Int'l, Inc. v. Lloyds Underwriters, 735 F.2d 679, 683 n.5 (2d Cir. 1984) ("In admiralty demurrage, the loss of profits or the loss of the use of a vessel pending repairs or other detention, is not an allowable item of damage absent reasonable certainty of a pecuniary loss.") (citing The Conqueror, 166 U.S. 110, 125 (1897)); Gladsky v. Sessa, No. CV 06-3134 ETB, 2007 WL 2769494, at *5 (E.D.N.Y. Sept. 21, 2007) ("Where a pleasure craft, such as defendant's, has no history of income, the owner is not entitled to damages for the loss of its use."); accord In re Essroc Canada, Inc., No. 01-CV-6319T, 2002 WL 31557973, at *3-4 (W.D.N.Y. June 14, 2002).  And because Herzig refused to repair the Crescendo, he failed to mitigate his damages.  See M. Golodetz Exp. Corp. v. S/S Lake Anja, 751 F.2d 1103, 1112 (2d Cir. 1985) ("The damage rule in admiralty cases generally does not differ from ordinary contract rules.  As in any other action for contract damages, a shipper is under a duty to mitigate his losses." (citation omitted)); see also Real Asset Mgmt., Inc. v. Lloyd's of London, 61 F.3d 1223, 1229-30 (5th Cir. 1995) (insurer not liable for deterioration of building that policyholder refused to repair).

39.    As to repair costs, given the disparities among the contemporaneous estimates obtained at the time of the damage (GLX 10-11, 13), this Court has no confidence that the $213,665.06 that Herzig paid for repairs – as opposed to the $175,000 that Great Lakes paid Herzig pursuant to the Release – represents the "reasonable costs of repairs." (GLX 3 § 9(w))

40.    In sum, Herzig has not shown that he is entitled to damages.

## CONCLUSION

For the reasons stated above, the Court finds that Great Lakes is not liable to Herzig on his First, Second, and Third Counterclaims. The Clerk of Court is directed to enter judgment for Great Lakes, and to close this case.

Dated: New York, New York
         January 31, 2025

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge